No. 84-247

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

_____

ALAN D. NICHOLSON,

       Plaintiff and Respondent,

-vs-

UNITED PACIFIC INSURANCE COMPANY,

       Defendant and Appellant.

_____

APPEAL FROM:  District Court of the First Judicial District,
In and for the County of Lewis & Clark,
The Honorable Henry Loble, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        George T. Bennett; John R. Kline argued, Helena,
Montana

    For Respondent:

        Luxan & Murfitt; Gary Davis argued & Terry Cosgrove
argued, Helena, Montana

_____

Submitted:  June 18, 1985

Decided:  December 17, 1985

Filed: DEC 17 1985

_____
Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

The defendant, United Pacific Insurance Company (UPI) appeals from a judgment entered upon a jury verdict, and the subsequent denial of its motion for a judgment notwithstanding the verdict, in the District Court of the First Judicial District, Lewis and Clark County.

Nicholson, the plaintiff, instituted suit against UPI following a notice of default. He alleged several causes of action, including breach of contract, negligent misrepresentation, and fraud and deceit. He requested specific performance, compensatory damages and an award of punitive damages for breach of the implied covenant of good faith and fair dealing. UPI answered and counterclaimed alleging breach of contract, fraud in the inducement and breach of the implied covenant of good faith and fair dealing. We affirm the judgment and the denial of UPI's motion for a judgment notwithstanding the verdict .

UPI, a Washington based insurance company, has a branch office in Helena, Montana. Although subsequently renewed, UPI's lease on its space was due to expire September 30, 1982. UPI desired to locate new and larger office space in Helena.

Nicholson owns a building in downtown Helena called the New York Block. He also owns two construction companies, Nicholson, Inc. and Alan D. Nicholson, Inc. One of Nicholson's construction companies did the construction work in the New York Block.

In late 1980 or early 1981, Nicholson learned of UPI's desire for new office space. He contacted Jess Starns, the Helena branch manager, and suggested UPI consider locating in the New York Block. James Heath, facilities vice-president

2

for UPI, came to Helena in July 1981 and toured the space offered by Nicholson. Thereafter, Nicholson wrote a series of letters to Starns and Heath encouraging UPI to rent space in the New York Block. Along with the letters, Nicholson forwarded various draft proposals for both the New York Block and the surrounding downtown mall area. Additionally, Nicholson represented to UPI that he would remodel the New York Block to UPI's specifications at his own cost.

In January 1982 both parties executed a letter of intent to enter a lease. Nicholson then proposed and circulated a draft lease. After negotiations, the parties both signed the lease by April 14, 1982. Two key conditions of the lease agreement were the requirement that Nicholson confer with UPI about the renovation of the New York Block space and that the final plans were subject to mutual approval.

While work progressed, disputes arose between Nicholson and UPI over the renovation project. These disputes revolved around interpretation of the renovation plans and about aspects of the project that had not been included within them. Nicholson and his architect were constantly in contact with the UPI planner in Seattle, Washington and the company architect in New York City.

On July 29, 1982, John Heath visited Helena. At this time he told Nicholson that UPI had never approved the construction plans. After the Heath visit, more problems arose. In addition to the problems with interpreting the construction plans, Nicholson and UPI began noting difficulty in dealing with each other. Nicholson had increasing trouble in communicating with the appropriate authorities within the UPI corporate structure to gain approval of his proposals. In August, Nicholson called the UPI architect directly in New

3

York City and discovered that he was out of the office until August 25, three days before the project was to have been completed. On August 24 Nicholson sent his final revised plans to UPI. On August 27 Nicholson received a letter from UPI rescinding the lease. The letter alleged Nicholson's latest architectural drawings were incomplete and lacking in proper specification and detail, that the circumstances had changed materially and that the New York Block area was blighted.

UPI concluded:

> Our investment in time and money continues to be greater than yours; therefore, from a business standpoint we have no choice but to rescind our lease. We will cease further activity on this project.

Up to this point Nicholson had expended $91,783 in remodeling costs. Nicholson then attempted to contact the president of UPI. Failing that, Nicholson sent UPI a notice of default on September 10, 1982 and then filed a complaint.

During discovery it became apparent that, at the time the events surrounding this action occurred, a "secret" UPI task force had made several recommendations about reorganizing the company. Most pertinent to this case was the recommendation that many of the functions and employees of the Helena office be transferred to Salt Lake City, Utah. Thus, UPI would have no need for the expanded office space in the New York Block. Nicholson argued that when UPI realized this, it became intransigent and threw obstacles in his path to cause him to breach the lease agreement. Nicholson also argued that UPI's concern with alleged "urban blight" in the downtown area had never been made known to him until he received word of rescission. In response to UPI's allegations that he did not meet all of the specifications of

4

the architectural plans, he contended that he had difficulty in communicating and gaining approval for any final decisions; that UPI was intransigent on several aspects of the project which were merely being held as "bargaining chips;" and that, as with any renovation of an old building such as the New York Block, unforeseen difficulties arose. Based on all of this, Nicholson alleged UPI rescinded the lease without justification and thus, in addition to being liable for breach of contract, should be held liable for exemplary damages for a breach of the implied covenant of good faith and fair dealing.

In its answer and counter-suit UPI alleged Nicholson fraudulently misrepresented the conditions existing in both the New York Block and the downtown area and failed to fulfill the requirements called for in the architectural plans incorporated in the lease agreement. UPI contended Nicholson did this because he was in financial trouble and could not perform his contractual duties. Thus, UPI alleged, Nicholson began to "cut corners" thereby breaching the agreement. Further, UPI alleged Nicholson began to use items not specifically mentioned in the lease agreement or architectural plans as a tactic to bargain against the more costly aspects of the remodeling project. Finally, UPI attempted to portray Nicholson's work as shoddy.

The case went to trial on February 21, 1984. At the end of plaintiff's case UPI moved for a directed verdict and renewed this motion at the close of the evidence. The court denied UPI's motions and submitted the case to the jury. The jury returned a verdict in favor of Nicholson, assessing compensatory damages of $211,105 and exemplary damages of $225,000 against UPI. UPI then filed a motion for judgment

5

notwithstanding the verdict or, in the alternative, for a new trial.

Hearings were held on UPI's motion, on Nicholson's motion for interest to be assessed at 18% and his request for attorney's fees and costs. On May 4, 1984, the District Court entered an order denying UPI's motion for a judgment notwithstanding the verdict and new trial, setting the judgment interest rate at 10%, awarding Nicholson attorney's fees of $75,000 to bear interest at 10% and awarding him $858.70 of the requested $20,000 for costs. The District Court entered final judgment on May 23, 1984. On that same day, UPI filed notice of appeal and on May 24, 1984, Nicholson filed a notice of cross-appeal.

Appellant raises the following issues:

(1) Whether UPI was entitled to a directed verdict.

(2) Whether there was any basis in law for the jury's award of punitive damages.

(3) Whether the compensatory damages awarded to Nicholson were excessive as a matter of law.

(4) Whether Nicholson was entitled to an award of attorney's fees.

Nicholson presents the following issue on cross-appeal:

(1) Whether the District Court erred in setting the pre- and post-judgment interest rate at 10% and erred in its award of costs.

UPI characterizes the lease agreement as an executory, unilateral contract and argues that since Nicholson failed to perform, judgment should be granted to UPI as a matter of law, citing Rogers v. Relyea (1979), 184 Mont. 1, 601 P.2d 37. Further, it claims Nicholson did not prove that UPI wrongfully prevented his performance, thus, McFarland v. Welch (1913), 48 Mont. 196, 136 P. 391, mandates a verdict in

6

UPI's favor. In response, Nicholson argues the agreement required concurrent performance by UPI and he presented substantial evidence it wrongfully failed to do so.

In considering motions for a directed verdict or its procedural successor, a judgment notwithstanding the verdict, the District Court must view the evidence in a light most favorable to the plaintiff. MacDonald v. Protestant Episcopal Church (1967), 150 Mont. 332, 435 P.2d 369. If a prima facie case is made out, the motion should be denied. Motions made pursuant to Rule 50(b), M.R.Civ.P., cannot be granted if there is substantial conflict in the evidence. Like any form of directed verdict, it rests on a finding that the case of the party against whom it is directed is unsupported in some necessary particular. Jacques v. Montana Nat. Guard (1982), 199 Mont. 493, 649 P.2d 1319; Yetter v. Kennedy (1977), 175 Mont. 1, 571 P.2d 1152.

UPI interprets the contract too narrowly. Rather than simply calling for Nicholson to provide possession and adequate plans, the lease set up a bilateral obligation on UPI to work with Nicholson in designing and approving the remodeling plans. Thus, Rogers, 184 Mont. 1, 601 P.2d 37, which considers unilateral or "dependent" contract obligations, does not apply.

Section 4.01 of the lease specifies as follows:

> Landlord agrees, at its sole cost and expense, to make the space ready for occupancy by the Tenant to the Tenant's normal specifications for leased space as indicated on the Tenant's final plans which plans will be mutually approved by the Tenant and Landlord before work commences on the space.
>
> The work to be done by the Landlord, at it [sic] sole cost and expense, to make the space ready for occupancy will include the cost of architectural construction and layout and furniture arrangement documents mutually acceptable

7

> to Landlord and Tenant . . . If Tenant
> requests changes, Landlord's time to
> complete the premises will be
> appropriately extended. (Emphasis
> added.)

This language imposed on UPI an obligation to deal with Nicholson. In any satisfaction-type contract there is an obligation to act reasonably if withholding approval. Taking UPI's argument to its logical conclusion points to its weakness. Even assuming that Nicholson, in the middle of July, had forwarded to UPI remodeling plans that were adequate, would UPI still be able to avoid its obligation by refusing to approve them? No. The lease agreement put the parties into a situation where both had independent obligations to perform by dealing reasonably with the other over the precise details of the remodeling. The obligation each assumed in this regard was the obligation to co-operate--that co-operation was a condition to the other's performance. Therefore, we hold that the District Court properly denied UPI's motions for a directed verdict.

In the second issue, UPI argues punitive damages were not available to Nicholson as a matter of law. It bases this argument on the absence of any Montana cases imposing an obligation of good faith and fair dealing independent of a contract where the parties are in substantially equal bargaining power. This issue contains two separate parts. First, whether the implied convenant of good faith and fair dealing applies to the case at bar. Second, assuming the implied covenant applies and was breached by UPI, whether punitive damages are available.

Both Nicholson and UPI requested instructions on the implied covenant of good faith and fair dealing. Montana has long adhered to the rule that an instruction given without objection becomes the "law of the case." See e.g., Melzner

8

v. Chicago, Milwaukee & St. P. Ry. Co. (1915), 51 Mont. 487, 153 P. 1019, and Bolstad v. Groskurth (1961), 139 Mont. 64, 360 P.2d 101. UPI did not object to the instructions on the implied covenant and, further, the District Court gave one of the instructions offered by UPI. However, in order to properly address the question of whether a basis for punitive damages exists, we must discuss whether the implied covenant of good faith and fair dealing applies in this case and whether the covenant was breached.

In First Security Bank of Bozeman v. Goddard (1979), 181 Mont. 407, 593 P.2d 1040, we observed that the "special considerations" giving rise to the implied covenant in consumer insurance contracts "do not apply to an ordinary contract between businessmen." 181 Mont at 419, 593 P.2d at 1047, quoting Battista v. Lebanon Trotting Association (6th Cir. 1976), 538 F.2d 111, 117-118. Much has happened to Montana case law on this issue since Goddard and Battista. See, Graham and Luck, The Continuing Development of the Tort of Bad Faith in Montana, 45 Mont.L.Rev. 43 (1984) and Harman, An Insurer's Liability for the Tort of Bad Faith, 42 Mont.L.Rev. 67 (1981). Here, the District Court interpreted our recent cases as implying the covenant of good faith and fair dealing into the contract between Nicholson and UPI and allowed Nicholson to recover for the correlative tort. The District Court may have been motivated by the fact that both parties originally alleged the other to have acted in breach of the implied covenant and the case went to the jury on instructions from both parties.

We recognize the call of commentators and attorneys alike for this Court to address the uncertainty this new area of law has engendered. We observe though, that uncertainty is characteristic of any new area of law in our common law

9

system. Nonetheless, the time is appropriate to more fully articulate our conception of what has been termed loosely as "bad faith," but is termed more accurately as the tort of breach of the implied covenant of good faith and fair dealing.

In Montana, we have not expressly extended this tort to all contract breaches. In Reiter v. Yellowstone Co. (Mont. 1981), 627 P.2d 845, 38 St.Rep. 686, this Court began the process of implying the covenant in some contracts. There, we found "some basis for implying covenants of good faith in contracts," Reiter, 627 P.2d at 849, citing § 28-1-201, MCA, but went no further. Thereafter, we began finding the covenant present in a variety of contractual situations, characterized by aspects of adhesion or inequity. In Owens v. Parker Drilling Co. (Mont. 1984), 676 P.2d 162, 41 St.Rep. 66; and Goddard, 181 Mont. 407, 593 P.2d 1040, this Court found these aspects indicated in the particular contractual relationship by the fact that the legislature had enacted laws setting forth a specific duty on the part of one of the parties to redress the inequities of the situation. In Owens, 676 P.2d 162, the employer allegedly violated §§ 49-4-101 and -102, MCA, prohibiting an employer from discharging an employee solely because he was handicapped. In Goddard, 593 P.2d at 1047, the insurer violated the specific statutory duty in § 33-21-105, MCA, to settle valid claims promptly.

The covenant of good faith and fair dealing has been implied in situations where there is no specific statutory duty, but where similar indicia of adhesion or inequality is present. In Weber v. Blue Cross of Montana (1982), 196 Mont. 454, 464, 643 P.2d 198, 203, this Court ruled:

> Blue Cross has an obligation to act in good faith with its members. This is especially true because Blue Cross is in a much _better bargaining position_ than those applying for membership in its program. (Emphasis added.)

On this basis, a legal obligation of good faith and fair dealing also has been extended to employers dealing with employees in Gates v. Life of Montana (Mont. 1983), 668 P.2d 213, 40 St.Rep. 1287, and Dare v. Montana Petroleum Marketing Company (Mont. 1984), 687 P.2d 1015, 41 St.Rep. 1735; to fee arrangements between a lawyer and his client, Morse v. Espeland (Mont. 1985), 696 P.2d 428, 42 St.Rep. 251; and to banks dealing with customers, First National Bank of Libby v. Twombly (Mont. 1984), 689 P.2d 1226, 41 St.Rep. 1948 and Tribby v. Northwestern Bank of Great Falls (Mont. 1985), 704 P.2d 409, 42 St.Rep. 1133.

California law implies a covenant of good faith and fair dealing into every contract, commercial, insurance, employment, or otherwise. Cohen v. Ratinoff (1983), 147 Cal.App.3d. 321, 195 Cal.Rptr. 84, citing McWilliams v. Holton (1976), 248 Cal.App. 447, 451. Recently, in Seaman's Direct Buying Service, Inc. v. Standard Oil Co. (Cal. 1984), 686 P.2d 1158, the California court reaffirmed this, stating "the proposition that the law implies a covenant of good faith and fair dealing in all contracts is well established." 686 P.2d at 1166. In _Seaman's_, the California Supreme Court considered whether and under what circumstances the plaintiff could recover in tort for the breach of an arms-length contract. _Seaman's_ involved a marine fuel dealer who wished to lease re-developed wharf space from the city of Eureka, California. After negotiations with Standard Oil, the parties ultimately signed a letter agreement in which Standard promised a ten-year oil supply "subject to our

11

mutual agreement on the specific wording of contracts to be drawn . . . " 686 P.2d at 1161. On that basis Seaman obtained a forty-year lease. One year later Standard notified the dealer that it would not proceed with the agreement because of market conditions and other factors. When pressed, Standard took the position that no contract had ever been signed. The California Supreme Court invented a new tort and held that a defendant would be subject to tort remedies when, in addition to breaching the contract, it sought to shield itself from liability by denying in bad faith and without probable cause, that a contract exists or ever existed. The Seaman's court carefully limited the scope of the new tort to egregious situations. The California Court of Appeals, in Quigley v. Pet, Inc. (1984), 162 Cal.App.3d 223, 208 Cal.Rptr. 394, explained this new tort as "depending upon a special kind of impermissible activity . . . " 208 Cal.Rptr. at 402.

While we decline to extend the breach of implied covenant to all contract breaches as a matter of law, as California has done, we agree with the statement in Quigley, supra, that the tort resulting from its breach depends on some impermissible activity. The Montana cases discussed above focus on the action of the breaching party in the relationship to find a breach of the implied covenant, not just the existence of a breach of contract.

At this point a helpful distinction should be noted between an intentional breach or one motivated by self-interest, giving rise to only contract damages, and the action which would give rise to a breach of the implied covenant, resulting in tort damages. Historically, a party to a contract generally had the right to breach and pay damages rather than perform. The non-breaching party,

12

theoretically, is "made whole" from the damages paid following the breach and thus still receives benefits from the agreement.

> Contract law is based in part upon the assumption that certain intentional breaches are to be encouraged. Permitting parties to breach their contracts promotes an efficient economy, at least when the gains from the breach exceed the expected pecuniary injuries of the promisee.

Diamond, The Tort of Bad Faith Breach of Contract: When, If At All, Should It Be Extended Beyond Insurance Transactions, 64 Marquette Law Review 425, 453 (1981). But whether performing or breaching, each party has a justifiable expectation that the other will act as a reasonable person. Neal v. Farmers Ins. Exchange (Cal. 1978), 582 P.2d 980. The nature and extent of an implied covenant of good faith and fair dealing is measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously or unreasonably, that conduct exceeds the justifiable expectations of the second party. The second party then should be compensated for damages resulting from the other's culpable conduct.

In the case at bar, the jury awarded Nicholson both compensatory and punitive damages as a result of UPI's conduct. Section 27-1-221, MCA (1983), in effect at the time of trial, provided:

> In any action for a breach of an obligation not arising from contract where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant.

As discussed above, the implied covenant of good faith and fair dealing is not an obligation arising from a contract. In order for punitive damages to be awarded in a tort action

13

for a breach of this covenant, the breach must amount to oppression, fraud or malice, as stated in the statute.

Another concern in this issue is whether substantial evidence supported the jury's verdict on punitive damages. Substantial evidence is relevant evidence which a reasonable person could accept as adequate to support a conclusion. See, e.g., Harmon v. Deaconess Hospital (Mont. 1981), 623 P.2d 1372, 38 St.Rep. 65. The District Court, in reviewing UPI's motion for judgment notwithstanding the verdict and new trial, noted that the parties produced contradictory evidence on every substantive fact issue. It also noted:

> At the time the plaintiff (a very credible witness) was testifying, at the end of his direct, there might have been some doubt as to whether he had presented enough facts to justify the awarding of exemplary damages. However, after intensive and searching cross examination of plaintiff, he amplified and enhanced his testimony on punitive damages to such a degree that there was no doubt that an award of such was justified if the jury chose so to do.

We hold the jury had adequate evidence on which to find the culpable conduct necessary for an award of punitive damages.

The jury received instructions discussing malice and fraud, several of which were submitted by UPI. UPI objected to an instruction offered by Nicholson which stated in part:

> Punitive damages may be awarded for recklessness, for reckless conduct, for willful or wanton misconduct, willful disregard of duty, or willful or wanton disregard of the rights of others. In Montana, the above and foregoing conduct may amount to presumed malice which has been defined as follows:
>
> "When a person knows or has reason to know of facts which create a high degree of risk of harm to the substantial interests of another, and either deliberately proceeds to act in conscious disregard of or indifference to that risk, or recklessly proceeds in unreasonable disregard of or indifference to that risk, his conduct meets the

14

> standard of willful, wanton, and/or
> reckless to which the law of this State
> will allow imposition of punitive damages
> on the basis of presumed malice."

This instruction apparently was drawn from Owens v. Parker Drilling Co. (Mont. 1984), 676 P.2d 162, 41 St.Rep. 66, where this Court adopted a standard for presumed malice expressing a "level of conduct . . . so culpable as to warrant an award of punitive damages." Owens, 676 P.2d at 164, 41 St.Rep. at 69. The instructions as a whole given by the court required the jury to find egregious conduct before awarding punitive damages. We find no error in the giving of this instruction under these circumstances.

The third issue asks whether Nicholson received excessive compensatory damages. The jury returned a verdict on Nicholson's claim for breach of the lease agreement for $211,105. The instructions included requests for $115,572 for the value of the lease and for $95,533 for remodeling expenses and finance charges on those expenses. UPI argues that Nicholson received a double recovery because the verdict awarded him both the full lease value, and the remodeling expenses he had incurred prior to the breach. This, UPI contends, is in violation of § 27-1-303, MCA, which requires that:

> No person can recover a greater amount in
> damages for the breach of an obligation
> than he could have gained by the full
> performance thereof on both sides unless
> a greater recovery is specified by
> statute.

They also argue that renovation costs are not recoverable as special damages for breach of an agreement to enter a lease. H.S. & D. Investment Co. v. McCool (Or. 1932), 9 P.2d 809 and Brodsky v. Allen Hayosh Industries (Mich. 1965), 137 N.W.2d 771. Nicholson responds that the jury received proper

instructions, that the evidence produced at trial supports the verdict and that UPI waived any objection.

The jury was properly instructed on the amount and type of damages it could award. The court gave a general contract damages instruction pursuant to § 27-1-311, MCA, followed by instructions relating to Nicholson's duty to mitigate the damages by attempting to re-lease the premises. Finally, the jury was instructed that:

> If you find that Plaintiff made alterations in the property to adapt it to the special use of the Defendant, and that as renovated for Defendant the property is not suitable for other tenants, then Plaintiff may recover the expense of renovation as special damages for breach of contract.

This special damage instruction is adequate in light of Purington v. Sound West (1977), 173 Mont. 106, 111, 566 P.2d 795, 798, where we explained that "special damages are the natural but not necessary result of the wrong or breach."

The District Court, in denying UPI's motion on this point observed:

> Defendant claims that the compensatory damages were excessive and there was a double recovery. There were two principal witnesses on this question, plaintiff and expert fee appraiser Bob White. The jury accepted their testimony, as they had a right to do. . . Defendant claims: "There was absolutely no testimony that any of the features of the office space were unique to the defendant United Pacific." . . . From this defendant argues that there was a double recovery, once for the remodeling, and again for the rental. However, there was a quantity of testimony by plaintiff and by White that there was very little, if any, chance of leasing this space to any other tenant and that the remodeling which had been done would have to be torn out and a complete new renovation performed for any new tenant. Indeed, the testimony was that it would be very difficult to get a new tenant but that if one was obtained, that the renovation would have to be completely different and the premises

16

> rebuilt to meet that new tenant's individual taste. Thus the jury could have believed that the plaintiff derived no benefit whatever from the remodeling which he did and which cost him, according to his testimony, in excess of $90,000.00.

Nicholson did not receive double recovery under the jury verdict. His expectancy, when entering into the lease agreement was two-fold. First, he would have the rent payments for the term of the lease. Secondly, he would have, at the end of that term, a finished office space and for that reason would be in a position of comparative advantage vis-a-vis any competition for the next lease UPI would enter into. This second expectancy was also damaged by UPI's breach.

We do not rely on the narrow rule articulated in H. S. & D. Investment, 9 P.2d 809 and Brodsky, 137 N.W.2d 771, for two reasons. First, those cases are factually distinguishable from the case at bar. In those decisions, within 5½ and 20 months respectively, new tenants were found for the premises at the same rent the defaulting lessees had agreed to pay. In H. S. & D. Investment, 9 P.2d at 811, the lessor did not request as special damages the costs of renovating the premises for the lessee prior to the breach, as Nicholson did here. Rather, the lessee requested, and the Oregon court held, that the defaulting lessee was not responsible for the remodeling costs incurred after the breach. In Brodsky, 137 N.W.2d 771, the lessor was not required to make any special renovations of the premises for the lessee. Here, prior to entering into the lease agreement, UPI requested, and had a great deal of control over, a very specific renovation for its particular purposes. Second, to hold, under Brodsky, supra, that renovation costs are not recoverable would work an injustice and fly in the

17

face of strong evidence of injury. We choose to follow the more fundamental rule that damages are designed to make the injured party whole and to compensate for the injury caused by the breach. Agrilease Inc. v. Gray (1977), 173 Mont. 151, 566 P.2d 1114; Bos v. Dolajak (1975), 167 Mont. 1, 534 P.2d 1258.

UPI argues that since the District Court erred in not directing a verdict in its favor, it consequently erred in awarding attorney's fees, as provided for in the agreement, to Nicholson. Since we ruled above that the District Court did not err, UPI cannot prevail with this argument. UPI makes no other allegation that the award of attorney's fees is not supported by the evidence or is otherwise flawed, so the award stands.

In the last issue, Nicholson alleges error because the District Court set the judgment interest rate at 10% rather than the requested 18% and awarded him only $858.70 of the requested $20,000 in costs. Nicholson points to Section 18.09 of the lease agreement which provides that UPI was to indemnify him for finance costs of the construction at a rate of 18%. Nicholson argues that this same rate should apply to all liabilities under the lease, and cites several cases holding that interest rates set in a contract should also apply to any pre- and post-judgment liabilities. For example, in Pacific States Corporation v. Hall (9th Cir. 1948), 166 F.2d 668, the plaintiff brought suit on a promissory note which was due within five years after the date "with interest from date until paid at the rate of seven per cent per annum, payable quarterly, in advance." 166 F.2d at 672. The court enforced the note as written stating "where, as here, there is an express provision requiring a certain rate of interest until the principal is paid, the

18

contract must be so enforced." (Citations omitted.) 166 F.2d at 672. The other cases cited by Nicholson are to the same effect. Nicholson contends that the court abrogated the parties' agreement in setting the interest rate at the lower figure.

An interest rate contained in one relatively minor and discrete part of the contract should not be an umbrella over the entire obligation. It is contrary to the parties' legitimate expectations. The lease agreement was otherwise complete in almost every detail. If the parties intended Section 18.09 to apply to all obligations arising from the agreement including breach, they could easily have so stated. Pacific States, 166 F.2d 668, is not controlling because it dealt with a simple obligation, a promissory note. The judgment in that case was directly on the note. Here, we have damages for breach of contract and, in addition, attorney's fees and other costs beyond the contract amount. The District Court reasoned that these damages were not amounts due under the contract for lease and thus not matters envisioned by the parties. We hold that the District Court correctly applied the statutory rate of interest provided for in § 25-9-205(2), MCA, to the judgment rendered in this case.

Following the judgment, Nicholson made an application, pursuant to § 25-10-501, MCA, for statutory costs and requested the court award him "expenses and disbursements" pursuant to Section 14.03 of the lease. The court awarded only the costs recoverable by statute. He elected to claim his costs through a cost bill, and the court correctly limited him to statutory costs. Nicholson cites authority for the proposition that the parties to a contract may agree to a recovery of expenses greater than provided by statute. Although that is a correct statement of law, see, e.g.,

19

Leaseamerica Corp. of Wis. v. State (Mont. 1981), 625 P.2d 68, 38 St.Rep. 398; and Bovee v. Helland (1916), 52 Mont. 151, 156 P. 416, it does not address the issue presented by the District Court's order. We hold that the District Court correctly awarded costs.

The judgment entered on the verdict and the denial of the motion for judgment notwithstanding the verdict are affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices


Mr. Justice John C. Sheehy, specially concurring.

I concur with the above opinion of Mr. Justice Gulbrandson, especially its result. I have some different conceptions of the source and legal effect of the implied covenant of good faith and fair dealing in contracts, which I will express when necessary. The majority opinion here serves well the case before us, and gives direction to courts and lawyers in this developing field.

_____
Justice

20