No. 84-226

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

_____

CENTRAL BANK OF MONTANA,

        Plaintiff and Respondent,

   -vs-

DEAN A. EYSTAD and MARCIA L. EYSTAD,

        Defendants and Appellants.

_____

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Joel G. Roth, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Church, Harris, Johnson & Williams; William A. Reid,
        Great Falls, Montana

    For Respondent:

        Alexander & Baucus; Ward E. Taleff, Great Falls,
        Montana

_____

Submitted on Briefs: July 25, 1985

Decided: December 18, 1985

Filed: DEC 18 1985

_____
Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Dean and Marcia Eystad appeal a judgment of the Cascade County District Court permitting Central Bank of Montana (Central Bank) to foreclose on certain parcels of Eystads' real property and denying Eystads' counterclaims. The issue on appeal is whether there was substantial credible evidence to support the District Court's judgment. We hold that there was such evidence and, accordingly, we affirm.

Appellants set forth three specific issues:

(1) Did the District Court err in ruling that Central Bank could foreclose on Eystads' real property without liability for damages to their business?

(2) Did the District Court err in denying Eystads' counterclaim against Central Bank for an alleged breach of the covenant of good faith?

(3) Did the District Court err in denying Eystads' motion to stay judgment?

Eystads have been customers of Central Bank for many years. They own and operate a business engaged in the manufacture and sale of building trusses. Beginning as early as 1963, Eystads obtained loans from Cental Bank and secured the loans with mortgages on their home and business property. In 1977, Central Bank made the first "operating loan" to Eystads. Eystads obtained this loan to provide funds for the operation of their business. Eystads gave Central Bank a mortgage on real property in Great Falls, Montana to secure a second operating loan obtained by Eystads in 1977. This mortgage contained a future advance clause to secure future advances from the Bank up to the amount of $60,000. In later years, Central Bank made frequent operating loans to Eystads.

Most of the loans were intended to be secured by the 1977 mortgage, under the future advance clause. These loans were evidenced by promissory notes generally providing for a lump sum payment due in six months. In some instances, Eystads would pay only the interest due on the due date and would renew the loan with a new promissory note. Often they would also borrow additional funds, with the new promissory note reflecting the new advances as well as the unpaid principal from the prior note.

In February 1982, Central Bank renewed an existing $50,000 loan of Eystads for six additional months. On February 2, 1982, prior to the loan renewal, a Central Bank officer wrote to Eystads indicating that in connection with the renewal Eystads would be expected to substantially reduce the amount they owed. On February 4, Eystads executed a new note evidencing the renewal. Central Bank drew up and Eystads signed a new mortgage on business property to secure this loan. This is the mortgage at issue in the instant case. Central Bank required the new mortgage because the bank may have been unsecured as a result of loans to Eystads (which loans were intended to be secured by the first mortgage) possibly in excess of the $60,000 future advance clause of the first mortgage.

The February 4 note was due on August 4, 1982. On August 4, 1982, Eystads met with two bank officers. Eystads wanted to pay the interest accrued on the note and requested a six month extension of the note. Central Bank agreed to a ninety day extension of the note, setting the new due date at November 2, 1982.

Jeffrey Mortensen, an assistant vice-president of Central Bank, was at the August 4th meeting with Eystads. He

testified that Eystads were informed at the meeting that their loan would not be renewed after November 2, 1982, without a significant reduction in the outstanding principal. Mortensen also testified that the bank officers told Eystads that the amount of reduction should approximate $25,000.

Mrs. Eystad talked with a bank officer, Scott Rubie, on October 28, 1982. She testified that that day Rubie told her there was a possibility that the Bank would not again extend the loan.

On November 9, 1982, Eystads again met with Central Bank officers. Eystads requested that the note due on November 2 be again extended for six months. Jeff Mortensen of the Bank was also at that meeting. He testified that the bank officials decided on November 9 to not take any action on the note, now due, for a couple of weeks. He stated that they made this decision so that Eystads could pursue refinancing from another source for the balance of the debt and so that Eystads could obtain funds owed to them. Mortensen testified that he urged Eystads to pursue this course of action and that he told Eystads that another extension of the loan would not be granted.

Mrs. Eystad also testified as to the import of the November 9 meeting. She stated that James Hopkins, the president of Central Bank, indicated to her that Eystads would be required to make a substantial payment on the principal of the loan, which had become due on November 2, before the Bank would extend the loan. She further testified that Hopkins stated that a substantial payment sufficient to extend the loan would be "around" $4,000 on the principal.

On December 7, 1982, Mr. Eystad spoke with Jeff Mortensen and offered to pay approximately $6,300 on the

4

operating loan due November 2. There apparently was a misunderstanding as to whether the total $6,300 would be applied on the principal of the debt. Mr. Eystad requested a six month extension of the note. The Bank, through Mortensen, refused to extend the note and later demanded payment in full. Mr. Eystad made no payment on the operating loan and instead applied approximately $6,000 to pay off a different loan secured by a mortgage on other property.

The bank officers handling the Eystads' loans kept comment sheets relating to those loans. A comment sheet reflects generally the history and circumstances of the loan. The comment sheets relating to Eystads' loans were introduced at trial. These sheets, and the February 1982 letter to Eystads, support Central Bank's contentions that (1) the Bank informed Eystads that their operating loan would not be further renewed or extended without a substantial reduction in the outstanding balance of the loan; and (2) the Bank contemplated, and informed Eystads, that the reduction should be approximately $25,000.

Central Bank, unwilling to grant Eystads a further extension on the loan, filed a complaint against Eystads in January 1983. Central Bank sought to foreclose the mortgage on real property which secured the loan due on November 2.

Eystads filed an answer and counterclaim in response to Central Bank. As their principal defense to the action, Eystads asserted that Central Bank was estopped from foreclosing the mortgage. The estoppel defense was based on the contention that Central Bank had for years engaged in the "practice and course of conduct" of renewing and/or extending Eystads' loans without demanding from Eystads a payment on the principal of the loan. Eystads further asserted that

they relied on this practice and course of conduct to their detriment and that Central Bank changed this business practice without any advance warning to Eystads. Consequently, Eystads counterclaimed against Central Bank for the premature and wrongful foreclosure of the mortgage.

Eystads also counterclaimed against Central Bank alleging the tort of bad faith and praying for punitive damages. Under this theory, Eystads alleged that the Bank intentionally and maliciously acted to injure Eystads.

The case went to trial in November 1983 and the District Court issued its findings of fact, conclusions of law and judgment in January 1984. Eystads make oblique objections alleging that the trial court adopted Central Bank's proposed findings and conclusions verbatim. However, they have not raised this as an issue on appeal. In any case, we find the trial court's findings of fact and conclusions of law to be detailed and complete.

The District Court held that the Bank was not estopped and could properly foreclose on the property. The court found that Eystads were bound by their promissory note and the Bank had no duty to renew or extend the note indefinitely. The counterclaims were rejected as without merit. Eystads appeal.

The first issue is whether the District Court erred in finding that Central Bank could properly foreclose the mortgage, without liability for damages to Eystads' business. The standard for review is set forth in Rule 52(a), Montana Rules of Civil Procedure, which provides that this Court may not set aside findings of fact unless they are clearly erroneous. Expanding on this standard, we have stated:

6

When reviewing findings of fact and conclusions of law of a district court, sitting without a jury, this Court has repeatedly held such findings and conclusions will not be disturbed if supported by substantial evidence and by the law. (Citation omitted.)

When reviewing evidence it will be viewed in the light most favorable to the prevailing party in the district court, and the credibility of witnesses and the weight assigned to their testimony is for the determination of the district court in a nonjury trial.

Kartes v. Kartes (1977), 175 Mont. 210, 217, 573 P.2d 191, 195; citing Luppold v. Lewis (1977), 172 Mont. 280, 284, 563 P.2d 538, 540.

The lower court made findings that, (1) the Bank was not estopped from foreclosing the mortgage; (2) the Bank's renewals and extensions of Eystads' loans were discretionary acts and did not imply an obligation to further renew or extend the loans; (3) the Bank gave Eystads adequate notice that a reduction in the principal of the loan was required; (4) the Bank gave Eystads adequate notice that further renewals or extensions would possibly not be granted; (5) the Bank was entitled to repayment of the loan which was past due; (6) Eystads' offer, in December 1982, to repay $3,000 of the loan principal was not a "substantial reduction" of the outstanding principal of $50,000; and (7) Eystads were not entitled to an extension under the Bank's assurance that an extension would be forthcoming if Eystads made a substantial reduction in the amount owed.

Substantial credible evidence supports these findings of fact. The testimony of the bank officers, parts of which have been cited and which the trial court found credible, support the finding that the Bank was acting in good faith and with justifiable business judgment in foreclosing the

7

mortgage. The bank's comment sheets, which were introduced into evidence, also support this view. The sheets show the Bank's legitimate concern with the loan and the Bank's efforts to communicate this concern to Eystads. The February 1982 letter from the Bank to Eystads also shows the Bank's forthright communications to Eystads. We uphold the District Court as to the first issue.

Similarly, we uphold the District Court's decision as to the second issue; i.e., the denial of Eystads' counterclaim for an alleged breach of the covenant of good faith and fair dealing. Counsel for Eystads have referred to their counterclaim as a claim for the tort of bad faith. The claim is more properly referred to as an alleged breach of the covenant of good faith and fair dealing. We do not concede that there was imposed upon Central Bank a covenant of good faith and fair dealing (as opposed to the obligation of good faith, defined as honesty in fact, imposed upon every contract or duty within the Uniform Commercial Code under § 30-1-203, MCA). However, even assuming arguendo such a covenant, there is substantial evidence, in the form of the testimony of three bank officers, the comment sheets, and the February 1982 letter, that Central Bank did not breach any covenant of good faith and fair dealing. This evidence, which the District Court was free to believe, portrays the bank representatives as candid and reasonable in their dealings with Eystads. Furthermore, a breach of the obligation of good faith imposed by § 30-1-203, MCA, is not, in and of itself, sufficient to support the award of punitive damages which Eystads requested. There must be some oppressive, malicious, or fraudulent conduct, above and beyond a breach of the statutory good faith obligation, to

support an award of punitive damages. See First National Bank of Libby v. Twombly (Mont. 1984), 689 P.2d 1226, 41 St.Rep. 1948. There is substantial evidence to support the trial court's denial of Eystads' counterclaim for breach of the covenant of good faith and fair dealing.

The third issue is whether the District Court erred in denying Eystads' motion to stay judgment. Eystads cite no authority for the proposition that judgment should have been stayed.

Rule 7 of the Montana Rules of Appellate Civil Procedure provides for a stay of judgment or order pending an appeal. Rule 7 states that, upon application, a District Court may in its discretion grant a stay of judgment. After reviewing the record of the hearing on the motion to stay judgment, we find that the District Court acted within its discretion in denying the motion to stay judgment. Further, Eystads did not post a supersedeas bond to stay judgment.

The District Court judgment is affirmed.

_____
Justice

We concur:

_____

_____

_____

_____
Justices

9