No. 86-231

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

---

DANIEL NOONAN and LEO NOONAN,
d/b/a EXCELSIOR MEATS,

        Plaintiffs and Respondents,

  -vs-

FIRST BANK BUTTE, a Corporation,

        Defendant and Appellant.

---

APPEAL FROM:  District Court of the Second Judicial District,
              In and for the County of Silver Bow,
              The Honorable Mark P. Sullivan, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        James A. Robischon argued, Kalispell, Montana

    For Respondent:

        John Doubek argued ; Small, Hatch, Doubek & Pyfer,
        Helena, Montana

---

Submitted:  April 3, 1987

Decided:  July 1, 1987

Filed:  JUL 1 - 1987

*Ethel M. Harrison*

Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

This is an appeal from a jury verdict and judgment entered by the District Court of the Second Judicial District, Silver Bow County, in favor of the Noonans and against First Bank Butte (FBB). The jury awarded the Noonans $800,000 for loss of profits, wages, business opportunities, and credit, and $700,000 for emotional distress. We reverse and remand for a new trial.

FBB raises nine issues on appeal. The case requires a new trial based on two of the issues raised. First, the jury was improperly instructed on the tort of bad faith, and second, the jury was improperly instructed on emotional distress. For the guidance of court and counsel on remand, we also discuss the issues of whether the jury should have been instructed on both the implied and statutory duties of good faith, the propriety of excluding certain testimony of an attorney for the Noonans, and whether the jury should have been instructed on negligence. Because we remand the case for new trial, we will not address the issues raised by FBB on sufficiency of the evidence.

Excelsior Meats was a partnership in Butte, Montana, operated by brothers Leo and Dan Noonan. Leo and Dan both have limited educational backgrounds and began working in the family business at a young age. Leo took care of the business aspect of the partnership and Dan worked in the store. Leo also operated a cattle feedlot. The cattle from the feedlot were sold to Excelsior Meats. Dan began his own feedlot operation in May 1981, and also sold cattle to the partnership.

Larry Dwyer was a loan officer at FBB. He had known Leo and Dan Noonan for a long time. There is a conflict in the testimony as to whether Mr. Dwyer first approached Leo Noonan

or vice versa, but in 1973, FBB began loaning money to Leo Noonan. The initial loan was for $7,000 to purchase cattle. The Noonans maintained a large checking account balance at FBB and promised to transfer $12,000 in certificates of deposit to FBB. No security was required for the loan.

Leo Noonan continued to borrow from FBB and by April 1975 had over $77,000 on loan. In 1975, FBB also loaned the Noonans $100,000 to expand their meat market building. This loan was secured by a real estate lien on their property.

In November 1980, John Johnson took over the Noonan loans at FBB. At that time, the loans to Leo Noonan and the partnership totaled almost $200,000, excluding the real estate loan. The loans were secured by feedlot cattle, inventory, accounts receivable, furniture, and fixtures of the meat market. When he took over the loans, Mr. Johnson requested financial statements and tax returns. Bob Prigge, a CPA and the Noonans' accountant, prepared the financial statements.

Mr. Johnson testified that at the time he believed the Excelsior Meats' financial statements supported FBB's loans to the Noonans. However, because the statements reflected only the Excelsior Meats' partnership income, they did not accurately show the profitability or debt of the total Noonan operations. Leo Noonan's feedlot business, which lost money in every year between 1977 and 1981, was not reflected in the financial statements. Mr. Prigge testified that he offered to provide tax returns for the feedlot operation but that Mr. Johnson refused. Mr. Johnson testified that he was not informed that the financial statements given to him were incomplete.

The financial statements did not disclose that between 1978 and 1981 the Noonans borrowed $125,000 from K.B. Williams, or that they borrowed $45,000 in 1980 from the

3

McLaughlins. Of even greater significance, the Noonans did not disclose to anyone in FBB and the financial statements did not disclose $220,000 owed by Leo Noonan to Miners Bank at the end of 1980, and $93,000 owed by Dan Noonan to Montana Bank in August 1981.

Based on the financial statements, Mr. Johnson renewed a $70,000 loan to Leo Noonan and the partnership in November 1981, and a $250,000 loan in December of the same year. The $70,000 loan was due on demand and was secured by certificates of deposit on account with FBB. The $250,000 loan was due in November 1982 and was secured by 220 head of steers at the feedlot, and by the inventory, accounts receivable, furniture, and fixtures at Excelsior Meats.

In March 1982, Leo Noonan received a letter from Miners Bank requiring payment of one of his delinquent loans. He contacted his attorney, who arranged a meeting with Miners Bank and FBB. At that meeting the Noonans disclosed debts of $980,156.54. Their assets, as of their most recent financial statement, for fiscal year 1980, were $509,800. This information is contained in defendants' Exhibit 10, introduced at trial.

On learning of the financial position of the Noonans, FBB contacted its attorneys. On their advice, and acting under the default provision of its security agreement, FBB froze the assets in the Noonans' partnership checking account and cashed in their certificates of deposit. The Noonans' counsel presented a workout plan to all three banks, but FBB refused to go along with the plan. In April 1982, FBB took control of and liquidated Excelsior Meats pursuant to an authorization for peaceful repossession of collateral signed by Leo and Dan Noonan.

Leo and Dan Noonan filed for bankruptcy individually and on behalf of the partnership in June 1982. They received

4

discharges in bankruptcy in October 1982. After the discharges, they paid $9,432 to bring current their mortgage payments to FBB and $8,100 to bring current other obligations on the market, including repair bills caused by FBB's repossession of the building. FBB returned the building to them, and Dan Noonan reopened the business.

In March 1984, the Noonans sued FBB. Dan Noonan testified his sales are approximately one-half their 1981 level, he has a hard time getting credit, and because of the bankruptcy he lost his USDA license, which enabled him to sell wholesale. The jury returned a verdict in favor of the Noonans for $800,000 in lost profits and $700,000 in emotional distress. FBB appeals.

I

Was the jury improperly instructed on the implied covenant of good faith and fair dealing?

FBB argues that the implied covenant of good faith and fair dealing cannot apply where a statutory duty of good faith exists. Here, a statutory duty of good faith is present under the Uniform Commercial Code, § 30-1-203, MCA:

> Every contract or duty within this code imposes an obligation of good faith in its performance or enforcement.

FBB also contends that, even if an instruction on the common-law duty of good faith is allowed in this case, the one given was inadequate.

This Court has not prohibited application of an implied covenant of good faith and fair dealing where there is a statutory duty of good faith present. In the past, the Court has extended the implied duty of good faith and fair dealing to cases involving banks dealing with their customers. In Tribby v. Northwestern Bank of Great Falls (Mont. 1985), 704

P.2d 409, 419, 42 St.Rep. 1133, 1142, we extended the implied covenant of good faith and fair dealing to the commercial area of bank-customer relations. In Nicholson v. United Pacific Ins. Co. (Mont. 1985), 710 P.2d 1342, 1347, 42 St.Rep. 1822, 1828, we noted the extension of the tort theory to banks dealing with customers and cited Tribby and First National Bank of Libby v. Twombly (Mont. 1984), 689 P.2d 1226, 41 St.Rep. 1948. In Northwestern Nat. Bank v. Weaver-Maxwell (Mont. 1986), 729 P.2d 1258, 43 St.Rep. 1995, we allowed a case of a bank-customer dispute to be remanded for retrial on a bad faith theory. In Central Bank of Montana v. Eystad (Mont. 1985), 710 P.2d 710, 42 St.Rep. 1850, we declined to determine whether the jury could be instructed on both the implied duty of good faith and fair dealing and the statutory duty of good faith imposed by § 30-1-203, MCA, as part of the Uniform Commercial Code. Instead, we found that there was sufficient evidence as a matter of law to support the trial court's denial of the tortious bad faith counterclaim. We hold that both an instruction on the implied covenant and an instruction on the UCC duty of good faith may be proper in this case. Whether such instructions are proper will depend upon the evidence submitted on retrial.

The instruction given on the implied covenant of good faith and fair dealing, instruction no. 24, was:

> You are instructed that First Bank Butte and its agents owed plaintiffs an implied-in-law duty of good faith and fair dealing in the banking relationship, that it should do nothing to unnecessarily deprive the plaintiffs of the benefits associated with the banking relationship between the parties. The duties or obligations arising from the banking relationship between the parties imposed an obligation of good faith in both the performance and enforcement of those duties and

6

> obligations. Good faith is defined as honest (sic)
> in fact in the conduct or relationship concerned.
> If you find that First Bank or its agents violated
> this obligation imposed by law, the plaintiffs are
> entitled to be compensated for all of the detriment
> or injury proximately caused thereby whether that
> detriment or injury could be anticipated or not.

This instruction is virtually identical to an instruction given in McGregor v. Mommer (Mont. 1986), 714 P.2d 536, 546, 43 St.Rep. 206, 218. It defines good faith as "honesty in fact", which is the definition given in the Uniform Commercial Code, § 30-1-201(19), MCA. We held in McGregor that breach of the UCC standard of honesty in fact is not enough to constitute a tort. The minimal requirement for the tortious breach of the covenant of good faith and fair dealing is action by the defendant which was arbitrary, capricious or unreasonable, and exceeded plaintiffs' justifiable expectation. McGregor, 714 P.2d at 543. The instruction given in this case inadequately defined the tort. We hold, as in McGregor, that giving of this instruction is reversible error.

## II

Did the lower court erroneously instruct the jury on damages for emotional distress and mental anguish?

Instruction no. 20 on emotional distress read:

> You are instructed that the law does not prescribe
> any definite standard by which to compensate an
> injured person for emotional distress or mental
> anguish. This case does not require that any
> witness should have expressed an opinion as to the
> amount of damages that would compensate for such
> injury. The law does require, however, that when
> making an award for emotional distress or mental
> anguish, the jury shall exercise calm and reason-
> able judgment. If you find for plaintiffs, you
> must award them damages for all emotional distress
> and mental anguish suffered as a result of the

7

defendant's conduct. The damages must be just and reasonable.

Notwithstanding the substantial amount of damages awarded for emotional distress, the record is devoid of significant evidence on this point. There was no medical testimony indicating emotional distress. The only testimony on this issue was the testimony of the Noonans themselves, and they made only general statements of mental strain and stress, inability to sleep, and stiffness. As a result, the statement in the above jury instruction that damages "must" be awarded may have misled the jury, especially in view of their $700,000 damage award for emotional distress.

The instruction given is, in relevant part, identical to an instruction given in McGregor. There, we held the jury instruction in effect directed a verdict on emotional distress because it stated the jury must award damages for all emotional distress suffered. We cited Johnson v. Supersave Markets, Inc. (Mont. 1984), 686 P.2d 209, 41 St.Rep. 1495, as authority for the proposition that we do not yet live in an eggshell society where every harm to a property interest gives rise to a right of action for mental distress. We said that mental distress is compensable absent a showing of physical or mental injury only if the tortious conduct results in a substantial invasion of a legally protected interest and causes a significant impact on the person of the plaintiff. McGregor, 714 P.2d at 544-45. Another instruction given in this case improperly required the jury to award damages for emotional distress without a finding of a substantial invasion of a legally protected interest and a significant impact on the person of the plaintiffs. We hold that the trial court erred in giving this instruction.

8

## III

Did the trial court err in excluding testimony of William Kebe, the Noonans' attorney during some of the time at issue in this action?

Attorney William Kebe represented the Noonans prior to and during the foreclosure of Excelsior Meats. At trial, FBB attempted to elicit testimony from Mr. Kebe about his impressions and observations as to whether FBB's conduct constituted bad faith, and about certain discussions he had with attorneys for FBB and Miners Bank. The District Court applied the attorney-client privilege and ruled the testimony inadmissible.

In Kuiper v. Dist. Court of Eighth Judicial Dist. (Mont. 1981), 632 P.2d 694, 38 St.Rep. 1288, we held that the attorney-client privilege applies to communications made by a client to his attorney and legal advice given in response in the course of professional employment. Section 26-1-803, MCA. The District Court correctly excluded testimony by Mr. Kebe on his evaluation of the Noonans' legal position because it was covered by the attorney-client privilege. Conversations occurring in the presence of third parties are not privileged. Jones v. Jones (Mont. 1980), 620 P.2d 850, 852, 37 St.Rep. 1973, 1976. In this case, the District Court correctly allowed FBB to elicit testimony from Mr. Kebe as to the conversations that took place at the meeting between bank officials, attorneys, and the Noonans. However, the District Court excluded Mr. Kebe's testimony about his conversations with third parties when the Noonans were not present. These conversations are not protected by the attorney-client privilege. On retrial, the District Court shall allow Mr. Kebe to testify about his conversations with third parties, whether or not the Noonans were present.

## IV

Did the trial court err in submitting the negligence theory to the jury?

FBB asserts that the jury should not have been separately instructed on negligence. We discuss the instruction because the case is returned for retrial. We have approved an instruction on a separate negligence theory in the employer-employee context of an action alleging breach of the implied covenant of good faith and fair dealing. Flanigan v. Prudential Federal Sav. & Loan (Mont. 1986), 720 P.2d 257, 263, 43 St.Rep. 941, 948; Crenshaw v. Bozeman Deaconess Hosp. (Mont. 1984), 693 P.2d 487, 493, 41 St.Rep. 2251, 2259. However, such an instruction must be supported by the pleadings and the evidence. We conclude that, on retrial, a negligence instruction may properly be given if the court concludes that the allegation of negligence is established in the pleadings and if the proof establishes a claim for the elements of negligence, including unreasonable conduct on the part of the bank.

Reversed and remanded for new trial.

We Concur:

_____
Chief Justice

_____
_____
Justices

_____
Justice

Mr. Justice John C. Sheehy, dissenting:


I dissent. The majority opinion leaves the Noonans bereft and gelded of their just verdict which arose from the unjust actions of the Bank.

The evidence heard by the jury was not cast in the form reported by the majority opinion. Instead the jury heard of business perfidy which the Bank could not deny and on which the jury based a necessarily substantial verdict.

The Noonan's were a respected business family in Butte. They had limited education, they were not country club folk, but they were hard working and industrious. The Bank's representative, Dwyer, saw their potential, and sought to obtain all of their banking business. It was through the Bank's agent that loans were originally made, without the requirement of financial statements or other financial data, and against the Bank's own protocol. Expansions of buildings and operations were counseled by the Bank and the promise was both expressed and implied that the money needed for their expanding operations would be supplied by the Bank.

When the Noonan's obtained loans, they signed whatever security agreements were required by the Bank and it is undisputed in this case that for the loans given, the Bank had a first position with respect to the assets and collateral which the Bank had required in making the loans.

The president of the Bank became furious when he learned that the Noonans had been borrowing money from other banks. On March 31, 1982, the Bank gave notice of default to the Noonans, based on the opinion of the Bank that the financial conditions and affairs of the borrower impaired the Bank's security, increased its risk, and that the Bank deemed itself insecure. When the notice was given, the Noonans had

faithfully made the payments which were due to Bank. They were not in default as to any payment and the Bank had a first position with respect to the collateral which it had demanded. Nonetheless the Bank after March 31, 1982, stopped all payments out of Noonans' checking account with the Bank, seized $70,000 in certificates of deposit which the Noonans had put up for collateral, and obdurately refused to cooperate to keep the Noonans in business. The Noonans were forced into bankruptcy. Thus did the Noonans lose the business which had been operated by their family for over 40 years.

That in brief was the factual background which led this jury, acting responsibly, to award the Noonans $800,000 for loss of profits, wages, business opportunities, and credit, and $700,000 for emotional distress.

The reversal of the judgment in this case on the ground of Instruction No. 24 is terribly unfair. The majority have disregarded the fact that this case was tried under the standards of good faith enunciated in the Uniform Commercial Code. Here the majority strikes Instruction No. 24 because "the minimum requirement for the tortious breach of the covenant of good faith and fair dealing is actions by the defendant which are arbitrarily, capricious, or unreasonable, and exceeded plaintiff's justifiable expectation." That statement finds its origin in Nicholson v. United Pacific Insurance Company (Mont. 1985), 710 P.2d 1342, 42 St.Rep. 1822.

Instructions based on Nicholson would be out of place in a trial of this case. The Noonans' transactions with the Bank were evidenced by commercial paper. As such, the instruments were covered by the Uniform Commercial Code. Section

30-3-101, et. seq. MCA. Under the Uniform Commercial Code, there is a statutory, as distinguished from a common law obligation of good faith. Section 30-1-203, MCA, provides that:

> Every contract or duty within this code imposes an obligation of good faith in its performance or enforcement.

Furthermore, under the Uniform Commercial Code, good faith is defined as "honesty in fact in the conduct or transaction concerned." Section 30-1-201(19), MCA.

The District Court in this case regarded the provisions of the Uniform Commercial Code, and instructed the jury accordingly.

This theory of recovery was acceded to by the Bank, because the instructions offered by the Bank and given by the court parallel Instruction No. 24. Those instructions offered by the Bank were court instructions No. 19 and 26. We set them out as follows:

INSTRUCTION NO. 19

You are instructed that both parties in a commercial relationship, such as existed between plaintiffs and defendant in this case, have the duty to deal fairly and in good faith with each other. Good faith is defined as meaning honesty in fact and observance of reasonable standards of fair dealing in the trade.

Therefore in this case, if you find that defendant did some dishonest act that harmed the plaintiffs; or that Defendant failed to observe reasonable standards of fair dealing in the transactions with plaintiff, then defendant acted in bad faith and is liable to the plaintiffs for any damages proximately caused thereby.

Conversely, if you find that defendant did not act in a dishonest manner or fail to observe reasonable standards of fair dealing in its transactions with

plaintiffs, then defendant did not act in bad faith and is not liable to the plaintiffs for any losses or damages claimed.

INSTRUCTION NO. 26

You are instructed that a term in a promissory note or security agreement providing that the lender may accelerate payment or performance "at will" or "when he deems himself insecure", or in words of similar import, mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired.

The burden of establishing lack of good faith is on the party against whom the power has been exercised, the plaintiffs, in this case.

There is not a dime's worth of difference between the instructions offered in this case by the Bank, and Instruction No. 24 which this Court uses to reverse the plaintiffs' verdict.

The majority has failed to distinguish that McGregor v. Mommer (Mont. 1986), 714 P.2d 536, 43 St.Rep. 206 was a common law implied covenant of good faith action to which the Nicholson definition applied from this action based on commercial paper, to which the Uniform Commercial Code applies. The instructions in this case were proper.

Finally, the majority have misinterpreted McGregor v. Mommer, supra, as to the impact of Instruction No. 20 on emotional distress.

In McGregor, the use of the word "must" in the instruction was held improper because damages for emotional distress are a tort remedy, and the jury in McGregor may have misinterpreted the instruction as applying to recovery on a contract claim. 714 P.2d at 544. The language of Instruction No. 24 is not improper in this tort claim,

- 14 -

because the language is conditioned first, on finding for the plaintiff on tort and secondly, that the emotional distress is a result of the defendant's conduct. The decision of the majority to reverse the emotional distress award seems to be based on insufficiency of the evidence to support the award which of course we should leave to the jury. It can be charitably said that the majority see no adverse emotional impact on the Noonans who saw their family business that had been 40 years abuilding crumble and disappear through the unfair conduct of the Bank.

_____
Justice

I join in the foregoing dissent of Mr. Justice John C. Sheehy.

_____
Justice