FILED

03/01/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0185

DA 21-0185

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2022 MT 42

TRUSS WORKS, INC., a Montana corporation,

       Plaintiff and Appellee,

  v.

OSWOOD CONSTRUCTION COMPANY, a Montana corporation,

       Defendant and Appellant,

  and

TRAVELER'S CASUALTY AND SURETY COMPANY OF
AMERICA, a Connecticut corporation, VOYAGEUR
APARTMENTS, LP, a Minnesota Limited Partnership,
and HUB INTERNATIONAL MOUNTAIN STATES LIMITED,
a Montana corporation,

       Defendants.

| | |
|---|---|
| APPEAL FROM: | District Court of the Eighth Judicial District,<br>In and For the County of Cascade, Cause No. DDV-16-405<br>Honorable John W. Parker, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

          Maxon R. Davis, Davis, Hatley, Haffeman & Tighe, P.C., Great Falls,
          Montana

      For Appellee:

          Kirk D. Evenson, Marra, Evenson & Levine, P.C., Great Falls, Montana

                  Submitted on Briefs: January 12, 2022
                          Decided: March 1, 2022

Filed:

_____
               Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     Oswood Construction Company (Oswood) appeals the Eighth Judicial District Court's decision and final judgment in favor of Truss Works, Inc. (Truss Works), to foreclose a construction lien against Oswood.  Oswood contends that the District Court erred by failing to make findings of fact or to otherwise address Oswood's counterclaim. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     Oswood is a commercial building contractor in Great Falls owned and operated by Douglas (Doug) Oswood and his two sons, Nicholas (Nick) and Troy.  In 2015, Voyageur Apartments, LP, awarded Oswood a contract to construct the Voyageur Apartments, a senior living apartment building in Great Falls.  Owned and operated by Ron Beeler and his son Greg, Truss Works designs and fabricates trusses. Truss Works submitted a bid to Oswood for the Voyageur Apartments, and Oswood selected Truss Works as the truss supplier.  The parties entered into a purchase order contract (Purchase Order) for the design and fabrication of wood trusses totaling $87,548.

¶3     Throughout the course of the project, Oswood and Truss Works had numerous disagreements regarding Truss Works's obligations under the contract, including its submission of truss drawings, its design of the trusses, and its design and supply of truss hangers.  The disputes culminated in January 2016 when Oswood refused to make payment of $25,831 to Truss Works for the last set of trusses.  Oswood further did not pay Truss Works $6,821 for the balance of the contract and additional change orders due May 7, 2016.

¶4     Truss Works filed a construction lien against the Voyageur Apartments on January 14, 2016.  Oswood obtained a construction lien release bond through HUB International Mountain States Limited and Traveler's Casualty and Surety Company of America.  Truss Works filed an action in the Eighth Judicial District Court to foreclose on its construction lien, and Oswood counterclaimed, alleging that delays attributable to Truss Works caused Oswood $118,571 in damages.

¶5     The District Court held a bench trial over four non-consecutive days.  Truss Works presented testimony that it designed and fabricated the roof trusses but was not paid for them or for the contract balance.  Oswood argued that Truss Works was not entitled to the remaining payments because Truss Works's failures to submit complete shop drawings, to timely deliver trusses, and to design and supply the connections for the trusses were breaches of the Purchase Order and caused Oswood to incur additional costs.  Each party called numerous witnesses and introduced voluminous exhibits.

¶6     The District Court issued its findings of fact and conclusions of law eighteen months after the trial concluded.  The court found that Oswood did not cooperate with Truss Works during the submission process, resulting in a ripple effect throughout the project's timeline.  The court acknowledged that Truss Works had improperly designed the second-floor trusses and had produced the truss designs "on a piecemeal basis"; it concluded, however, that Oswood's refusal to pay Truss Works its last installment constituted a "full[ ] breach" of contract.  Following additional proceedings on attorney fees, the District Court entered judgment in Truss Works's favor, awarding it $32,662 for the unpaid installment under the

Purchase Order, the balance of the contract, and the change orders, together with $39,113.23 in attorney fees.

## STANDARDS OF REVIEW

¶7 When a district court sits without a jury, we review the court's findings of fact for clear error and its conclusions of law for correctness. *Norwood v. Service Distrib., Inc.*, 2000 MT 4, ¶¶ 21-22, 297 Mont. 473, 994 P.2d 25 (citing M. R. Civ. P. 52(a)) (other citations omitted). A finding of fact is clearly erroneous if it is "not supported by substantial credible evidence," if the district court "misapprehended the effect of the evidence," or if our review of the record convinces us that the district court made a mistake. *Norwood*, ¶ 21 (citation omitted). "[I]n determining whether the trial court's findings are supported by substantial credible evidence, this Court must view the evidence in the light most favorable to the prevailing party." *Norwood*, ¶ 21 (citation omitted).

## DISCUSSION

¶8 *Did the District Court make sufficient findings of fact and conclusions of law in granting judgment to Truss Works without ruling on Oswood's counterclaim?*

¶9 Oswood argues that the District Court's findings of fact are clearly erroneous because the court never addressed its counterclaim and failed to mention the "virtually unchallenged" evidence supporting it. Truss Works asserts that the District Court implicitly rejected Oswood's counterclaim when it ruled that Oswood "fully breached" the contract. Truss Works urges us to apply the doctrine of implied findings to uphold the District Court's judgment.

¶10     Under M. R. Civ. P. 52(a)(1), when a district court acts as the fact-finder in an action tried without a jury, "the court must find the facts specially and state its conclusions of law separately." "The litmus test [under Rule 52(a)(1)] is whether a district court's order sets forth reasoning, based upon its findings of fact and conclusions of law, in a manner sufficient to allow informed appellate review." *State v. Baty*, 2017 MT 89, ¶ 13, 387 Mont. 252, 393 P.3d 187 (quoting *Snavely v. St. John*, 2006 MT 175, ¶ 11, 333 Mont. 16, 140 P.3d 492).

¶11     Oswood is correct that the District Court did not include the word "counterclaim" or make an explicit ruling on the counterclaim. But the court did address the evidence Oswood presented at trial in support of its claim for damages. Oswood's counterclaim alleged that Truss Works breached the Purchase Order and failed to timely perform its obligations, causing Oswood $118,571 in damages. At trial, Oswood asserted that Truss Works breached the Purchase Order by (1) failing to submit full, engineer-stamped and approved shop drawings, (2) improperly designing and failing to timely deliver trusses, and (3) failing to provide or design truss hangers as required under the Purchase Order. Testimony on these three topics comprised most of the trial.

¶12     The first issue, the submission of truss drawings, hinged on two conflicting provisions in the Purchase Order. Schedule A, Section 2(E) of the Purchase Order states: "All submittals, shop drawings, samples, and other submittal material must be transmitted through Contractor's office for approval. No submittals shall be submitted directly to the Owner, Architect, Engineers, or Agents without written authorization from

4

Contractor." The contract specifications for "Wood Trusses" referenced in the Purchase Order state conversely that the "Truss supplier shall submit shop drawings to the engineer for approval[.]"

¶13 Conflicting testimony at trial shows that the two parties had diametrically different interpretations of what the Purchase Order required. Ron, the owner of Truss Works, first testified to what a typical submittal process for truss drawings looks like. He explained that he generally submits drawings that have not been sealed to the general contractor for initial approval. The contractor then will approve the drawings or send them back with changes or requests. Truss Works will make any requested changes, then send the drawings to its engineer for review, obtain a Montana seal, and submit the sealed drawings to the contractor. Ron testified that the submittal process with Oswood was unusual because Oswood refused to accept his designs, required him to have the same date on each drawing, and demanded that Ron submit only engineer-stamped drawings to Oswood. Ron explained that a general contractor had never, in his forty-seven years of experience, required Truss Works to have his drawings stamped by an engineer and all labeled with the same date to be accepted for initial approval. Referencing the submission term in the truss specifications, Ron testified that he eventually sent one set of drawings directly to the project engineer after trying to work with Oswood and not receiving a response.

¶14 Oswood's witnesses testified to their experience with truss manufacturers and to their understanding of what the Purchase Order required. Doug explained that he has always asked for a complete submittal from a truss manufacturer, rather than receiving

5

drawings piecemeal. Nick explained that Truss Works was required under the Purchase Order to provide a full, engineer-stamped submittal for Oswood to review and send to the project architect because the architect required that the submittals be complete and stamped by an engineer before reviewing them. He testified that he eventually had Troy handle the submittal because the project was behind schedule and the submittals were holding up other subcontractors. On cross-examination, however, Nick admitted that Oswood had a complete submittal from Truss Works by July or August 2015 yet did not submit the drawings to the architect until September 9.

¶15 In addressing the submittal issue, the District Court found that the two referenced submittal provisions in the Purchase Order conflicted. The court held that "Oswood failed in [its] obligation to cooperate with Truss Works" during the submittal process; it "conclude[d] that Oswood failed to deal reasonably with Truss Works in resolving [the conflict in the Purchase Order] and breached [its] obligation to cooperate." Supporting this conclusion, the court cited *Nicholson v. United Pacific Insurance Company*, 219 Mont. 32, 710 P.2d 1342 (1984), opining that the Purchase Order, like the contract in *Nicholson*, was a "satisfaction-type contract," meaning that both parties had "an obligation to act reasonably if withholding approval" and to "cooperate" with each other. *Nicholson*, 219 Mont. at 38, 710 P.2d at 1346.

¶16 In *Nicholson*, a landlord and tenant entered into a lease agreement that specified the landlord would remodel the building for the tenant in accordance with the tenant's specifications. *Nicholson*, 219 Mont. at 37-38, 710 P.2d at 1346. The lease stated that the

6

plans must be "mutually approved by the [t]enant and [l]andlord before work commences[.]" *Nicholson*, 219 Mont. at 38, 710 P.2d at 1346. This Court concluded that this language "imposed . . . an obligation" on the tenant to deal reasonably and cooperate with the landlord in providing specifications for the remodel. *Nicholson*, 219 Mont. at 38, 710 P.2d at 1346. Unlike the lease in *Nicholson*, the Purchase Order was not a satisfaction-type contract. The Purchase Order did require that Oswood and its architect approve the submittals, but unlike the lease in *Nicholson*, there was no obligation for the parties' mutual approval of plans yet to be determined. Instead, the job specifications detailed specific requirements for the building trusses. Nothing in the Purchase Order obligated Oswood to cooperate with Truss Works in submitting its truss design plans. We agree with Oswood that the District Court's reliance on *Nicholson* was incorrect.

¶17    That notwithstanding, the District Court's conclusion that the two procedures set out in the Purchase Order for submitting truss designs were "in conflict" and that Oswood "failed to deal reasonably with Truss Works in resolving [the] conflict" were not incorrect and were supported by substantial credible evidence. Ron's testimony that Nick rejected his drawings and refused to forward them to the engineer during the submittal process supports the court's finding. Further, Nick admitted that Oswood had a full submittal from Truss Works at the end of August but did not submit the drawings to its engineer until September 9, 2015. Oswood's September 9 submittal of the truss drawings to its engineer supports this testimony. Four drawings—out of hundreds—are dated September 1 and 2. Despite having the full submittal on September 2, Oswood waited a week to submit them

7

to its engineer. E-mails between Ron, Nick, and Troy regarding truss drawings also support the court's finding that Oswood did not deal reasonably with Truss Works during the submittal process. While it appears that neither party communicated clearly with the other, resulting in many miscommunications, the e-mails document that Oswood requested truss drawings already in its possession and demanded that Truss Works have drawings restamped. In one e-mail, Ron explained that he was waiting on measurements from Oswood before completing the drawings. Oswood contends that the e-mails and the submittal evidence tend to show that Truss Works produced drawings piecemeal.

¶18 But the District Court did not, as Oswood claims, overlook Truss Works's partial responsibility for the delays and its "piecemeal" submission of drawings. The court held that Truss Works "produced truss designs on a piecemeal basis when a comprehensive set would be required, for ease of use and to get approval from the City of Great Falls." The District Court concluded, however, that the ambiguous nature of the submittal process in the Purchase Order should be construed against Oswood, as the drafter of the Purchase Order, and the court attributed most of the delays to Oswood's lack of cooperation.

¶19 After reviewing the record and viewing the evidence in the light most favorable to Truss Works, we conclude that the District Court did not clearly err when it determined that Oswood caused delays by failing to cooperate during the submittal process to resolve misunderstandings in light of the conflicting contract requirements. The District Court's findings, though sparse, demonstrate that the court credited Truss Works's accounting of

8

events. The court stated as much, finding twice that "Ron Beeler testified credibly" regarding his submission of shop drawings to Nick, Nick's rejection of the drawings, and Nick's refusal to forward the drawings to the engineer. Though the parties differed sharply in their testimonies and evidence on this issue, it is the role of the District Court as the trier of fact to make credibility determinations and weigh the evidence. "It is not this Court's function, on appeal, to reweigh conflicting evidence or substitute our evaluation of the evidence for that of the district court." *State v. Wetzel*, 2005 MT 154, ¶ 11, 327 Mont. 413, 114 P.3d 269 (citation omitted); *see also* M. R. Civ. P. 52(a)(6).

¶20 The District Court's credibility determination is supported by substantial evidence. Truss Works called a witness from Quality Foundation Company (Quality), the subcontractor hired by Oswood to pour the footings and walls for the Voyageur Apartments. The witness testified that he threatened to file a lien against the apartments because Oswood would not pay Quality the first installment. He explained further that Oswood shorted Quality around $4,000 in the last installment payment, back-charging Quality for items Quality had not bid. This testimony, coupled with the inconsistencies between Ron's testimony and that of Doug, Nick, and Troy and the court's admonishment of Oswood's witnesses for not answering questions on cross-examination, is sufficient to support the court's discrediting of Oswood.

¶21 Oswood further contended that Truss Works designed a portion of the trusses on the second floor without the required load factor, resulting in delays and additional costs. Though the parties disagreed about the reasons for the problem, Truss Works took

9

responsibility for the mistake and reengineered the trusses to comply with the additional load requirement. In addition to replacing the trusses, Truss Works paid $4,100 to Oswood for labor costs it incurred in replacing the incorrect trusses.

¶22 The District Court acknowledged Truss Works's mistake in its findings, concluding that "Truss Works is not blameless[; it] improperly designed a section of trusses (by failing to account for the load required)[.]" The District Court found that Truss Works accepted fault for this error, redesigned and manufactured the flawed trusses, and credited Oswood for the extra labor it incurred. The court's recognition of Truss Works's error, along with its finding that Truss Works fixed the trusses and paid Oswood for its labor, indicates that the District Court found that this dispute had been resolved.

¶23 Oswood further argued that Truss Works's failure to design and supply truss connections resulted in additional costs and delays. Much like the submittal issue, Oswood's and Truss Works's views of what the Purchase Order required were wholly antithetical. Ron testified at trial that his bid did not include hangers and that the Purchase Order did not require him to provide hangers. He explained that he told Oswood Truss Works could provide hangers but that it would need to buy them from a hanger supplier and mark them up. He testified to a conversation that he had with Nick, where Nick said "he'd tak[e] care of [the hangers] himself." James Resch, Truss Works's overseer, testified to the same understanding, citing a conversation he had with Nick where Nick told him that Oswood would "take care of all of these." Ron further explained that because he is not a structural engineer, he is not qualified to design hangers, but that he

10

told Oswood that he could provide suggestions for which hangers to use, and Oswood could run those suggestions by the project engineer.

¶24 Nick, Troy, and Doug all testified to their beliefs that Truss Works was obligated under the Purchase Order to provide hangers and other connections. All three men testified that Truss Works was required to provide hangers under specification Section 06 1753, titled "Shop-Fabricated Wood Trusses," which states that shop drawings must "[s]how truss configurations, sizes, spacing, size and type of plate connectors, cambers, framed openings, bearings and anchor details, and bridging and bracing." The Purchase Order itself does not contain the term "hanger" and states only that Truss Works is required to "[d]esign, detail, fabricate, and deliver all wood trusses."

¶25 Addressing the hanger issue, the District Court found that the parties disputed whether the Purchase Order required Truss Works to supply hangers and acknowledged Ron's testimony that he did not bid the hangers. The court included language from the specifications that required Truss Works to submit shop drawings showing "bearing and anchor details, and bridging and bracing[,]" and language from the roof framing plan that stated the "Truss Designer is responsible for providing detailed shop drawings for approval prior to fabrication. Shop drawings shall show layout, member sizes, connection plates, species of lumber, hanger types, and erection details." The District Court found that Oswood paid $1,048.34 for the hangers and paid its engineer $1,250 to design them.

¶26 Neither the court's findings of fact nor its conclusions of law explicitly resolve the hanger dispute. The District Court did find, however, that the Purchase Order between

11

Truss Works and Oswood "was for $87,548 to provide the *trusses*," and that "[t]he [P]urchase [O]rder required Truss Works to provide 'Shop Fabricated Wood Trusses: complete,' and that it was Truss Works'[s] responsibility to '[d]esign, detail, fabricate, and deliver all *wood trusses*.'" (Emphasis added.) The court further concluded that "Purchase Order No. 1 required that Plaintiff, '[d]esign, detail, fabricate, and deliver all *wood trusses*.'" (Emphasis added.)

¶27 Though it is not the job of an appellate court to review the record to make its own findings, "we have long adhered to the doctrine of implied findings[,] which states that where a court's findings are general in terms, any findings not specifically made, but necessary to the judgment, are deemed to have been implied, if supported by the evidence." *Baty*, ¶ 13 (citing *Snavely*, ¶ 11) (quotations and other citations omitted). To make an implied finding determination, "[t]his Court will consult both hearing transcripts and written findings[.]" *Baty*, ¶ 11 (citing *Brunette v. State*, 2016 MT 128, ¶ 36, 383 Mont. 458, 372 P.3d 476).

¶28 Necessary to the District Court's determination that the Purchase Order required Truss Works to "[d]esign, detail, fabricate, and deliver all wood trusses" was its implicit finding that the Purchase Order did not require Truss Works to "[d]esign, detail, fabricate, and deliver" hangers for the project. Given Ron and James's testimonies that Nick communicated he would take care of the hangers and the ambiguous language regarding the hangers in the Purchase Order and referenced specifications, there is sufficient evidence to support a finding that Truss Works was not required to supply the hangers. Furthermore,

12

the language cited by Oswood as creating an obligation for Truss Works to supply hangers has not the strength Oswood gives it. The specifications state only that Truss Works's drawings must show the hanger types and connection details, not that Truss Works must supply the hangers. The Purchase Order is ambiguous at best, and it was reasonable for the District Court to construe it against Oswood as the drafter.

¶29 In addition, Oswood's April 18, 2017 back-charge to Truss Works states, "Line Items 24 and 25 are floor deck hangers. While these were not included in Truss Works's purchase order, the lack of design prohibited selecting the most effective hanger. Truss Works told us to purchase the more robust hanger and charge them for them." This language indicates that Oswood recognized in April 2017 that Truss Works was not obligated under the Purchase Order to provide the hangers. Troy testified at trial that the language in the change order applied only to that specific set of hangers; the court may have found that testimony not credible, however, considering the ambiguity of the Purchase Order and Ron and James's testimonies about their conversations with Nick. Overall, the hanger issue was a minor part of Oswood's claimed damages at trial. Even if the court failed to state a specific finding about who was responsible, we conclude that its omission on the point is not sufficient to warrant reversal.

¶30 Finally, Oswood argues that the District Court erred in holding that "Oswood fully breached [its] contract with Truss Works" by not paying the last installment and contract balance under the Purchase Order. Highlighting that "fully breached" is not a legal term of art, Oswood posits that the court's finding actually is a finding that Oswood materially

13

breached the Purchase Order. A breach is material if it "touches the fundamental purposes of the contract and defeats the object of the parties in making the contract." *Norwood*, ¶ 29 (citations omitted). A breach that "goes to only part of the consideration" is an incidental, not a material, breach. *Norwood*, ¶ 29. The court's holding that Oswood "fully breached" is erroneous to the extent that it is a finding of a material breach. Truss Works was paid the first two installments—approximately 65% of the total contract amount with change orders—and filed its lien only after Oswood did not pay the third. A breach of partial consideration "does not warrant a rescission of the contract; the injured party is still bound to perform his part of the agreement, and his only remedy for the breach consists of the damages he has suffered therefrom." *Norwood*, ¶ 29. Because Oswood's breach of contract went only to part of the consideration, it was an incidental breach for which Truss Works could, and did, seek damages.

¶31 The District Court's holding is not error, however, to the extent it implies that alleged damages from the delay were Oswood's responsibility. As discussed above, the court's findings support its conclusion that Oswood largely was responsible for the delays associated with the submittal process. The court found further that delays in the submittal process compounded over the course of the project: "Delays in producing accepted truss designs delayed the fabrication of trusses, which delayed the installation of trusses, which delayed other subcontractors[.]" This finding, coupled with the court's determination that Ron's testimony was credible and that Oswood contributed more significantly to the design submittal delays demonstrates that the District Court found Oswood at greater fault. The

14

court's "fully breached" finding implicitly addresses Oswood's counterclaim as well. Necessary to its finding that Oswood was more responsible for the delays is an implicit rejection of its counterclaim. The court's holding that Oswood "fully breached" is therefore not erroneous and is supported by substantial evidence.

## CONCLUSION

¶32 The District Court's findings of fact and conclusions of law are "sufficient to allow informed appellate review" of its decision in favor of Truss Works. *Baty*, ¶ 13. Upon full review of the record and the parties' briefs, we conclude that the court's express and implied findings of fact are supported by substantial evidence, we are not left with a firm conviction that it made a mistake, and the court did not commit an error of law. We affirm the District Court's judgment.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ JIM RICE