FILED

07/12/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0492

DA 21-0492

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 140N

IN RE THE MARRIAGE OF:

KELDAH ELIZABETH HEDSTROM,

        Petitioner and Appellee,

  and

CODY CLAY PETERS,

        Respondent and Appellant.

APPEAL FROM:    District Court of the Sixth Judicial District,
               In and For the County of Park, Cause No. DR-2019-100
               Honorable Brenda R. Gilbert, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jami Rebsom, Jami Rebsom Law Firm P.L.L.C., Livingston, Montana

      For Appellee:

          Rebecca R. Swandal, Swandal Law PLLC, Livingston, Montana

Submitted on Briefs:  June 15, 2022

Decided:  July 12, 2022

Filed:

                                _____

                                     Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Cody Clay Peters appeals the findings of fact, conclusions of law, and final decree of the Sixth Judicial District Court, Park County, alleging several errors in the court's asset distribution, permanent order of protection, parenting plan, and child support order. We affirm.

¶3 Keldah Hedstrom and Cody married in 2016 and had a child, D.O.P., the following year. During their marriage, the couple split their time between two houses, one in Harlowton that Cody owned prior to the marriage, and one in Big Timber, purchased during the marriage with funds from the sale of an Oregon home Keldah owned prior to the marriage. Keldah and D.O.P. resided primarily in the Big Timber home, and Cody traveled between Big Timber and Harlowton. Keldah and Cody reactivated Ivory Horn Outfitters (Ivory), an outfitting business that Cody had owned before they married. Keldah owned a five percent interest in the business, with Cody owning the remainder. Despite her minority share, Keldah contributed approximately $41,563 of her own premarital assets to the business, in addition to her nonmonetary contributions. The couple also purchased fourteen cows during the marriage for $24,500. Keldah contributed $14,500 toward the

2

purchase and approximately $29,992 toward the cattle operation. The parties also purchased numerous vehicles and individually contributed to their own retirement accounts. The two separated in September 2019 when Keldah filed a verified petition for legal separation. Keldah moved to convert the separation action to a dissolution, and the case eventually went to trial on the dissolution of marriage.

¶4 Throughout the marriage, Cody was abusive to Keldah. At trial, she testified to multiple incidents of abuse, including Cody shooting her horse with a pellet gun, smashing a cell phone, and verbally abusing her. Cody's behavior intensified after they separated. He continued to harass Keldah, calling her incessantly and sending her vulgar and harassing text messages. Cody also would threaten to take D.O.P. and disappear. In April 2020, he broke into Keldah's Big Timber home. When Keldah asked him to leave, he became enraged, yelling at her and tearing photos off the wall. In May 2020, while Keldah was camping with friends, Cody called her nonstop and told her that "he was going to kill her."

¶5 On June 8, 2020, Cody was arrested for disorderly conduct for harassing Keldah, D.O.P., and Keldah's mother. Throughout the night, he sent numerous harassing text messages to Keldah, demanding that she give him D.O.P. He then showed up at Keldah's home around 10:45 p.m., circled the house screaming and yelling, and banging on every door and window. Keldah testified that she, D.O.P., and her mother hid inside the house until the police arrived and arrested Cody. Keldah's mother testified that D.O.P. was shaking and appeared to mentally dissociate during the incident.

¶6	On August 9, 2020, Cody became enraged after Keldah hung up on him. He sent her numerous threatening and vulgar text messages, stating that he would "drive straight down [to her house]" and that the result would not "be pretty." Keldah was not home that evening, and at some point, Cody broke into the house. He waited at the home until Keldah returned with D.O.P. and her stepfather Richard Funke the following day. When Richard entered the home, Cody "emerged from the hallway with a gun pointed at him." Cody held Richard at gunpoint and forced him to walk outside to Keldah and D.O.P. While brandishing the gun, he looked at Keldah and stated, "you're fucking dead." Cody then ordered Keldah and D.O.P. back into the house, and said "don't try anything, the safety is off." Once inside the house, Cody forced Keldah to lie face down on the living room floor, on top of shards of glass from the window he broke to enter the house. Cody then pointed the gun at Keldah's head and told her that he was "going to fucking kill" her. D.O.P. was present throughout the incident, crying and "begg[ing] Cody not to hurt his mom." Finally, Richard was able to talk Cody into setting the gun down.

¶7	Cody was arrested and charged with two counts of felony aggravated kidnapping and two counts of felony assault with a weapon. Two days later, Keldah filed for an order of protection for herself and D.O.P. Cody did not contest the petition, and the District Court granted her request.

¶8	About a year later, the District Court held a final hearing in the dissolution. The court heard testimony from Keldah and Cody, the parties' friends and family, and Cody's mental health providers. The parties also submitted numerous exhibits. The court issued its amended findings, conclusions, and final decree on September 20, 2021. The court

4

awarded sole custody of D.O.P. to Keldah and mandated that Cody have no contact with D.O.P. for at least one year while he attends counseling for "substance abuse" and "domestic violence." The court provided a mechanism by which Cody could regain parenting time, including maintaining his sobriety for at least one year, serving all required time in custody with the Department of Corrections for the August 2020 incident, if any, and undergoing a psychological evaluation by a mutually agreed upon psychologist.[1] The District Court ordered that the August 12, 2020 order of protection be made permanent for Keldah and D.O.P. but noted that the order could be modified as to D.O.P. in the future to allow for reunification. Finally, the court distributed the parties' marital property, ordering that Cody pay an equalization payment to Keldah of $60,595.50. Cody appeals, finding fault with the court's property distribution, the order of protection, the parenting plan, and the child support order.

¶9 We review for clear error a district court's findings of fact in a dissolution case. *In re Marriage of Crowley*, 2014 MT 42, ¶ 24, 374 Mont. 48, 318 P.3d 1031 (citation omitted). "A finding of fact is clearly erroneous if it is not supported by substantial evidence, the district court misapprehended the effect of the evidence, or our review of the record convinces us that the district court made a mistake." *Crowley*, ¶ 24 (citations and quotations omitted).

---

[1] The criminal case had not been finally resolved at the time of the decree. The Court, pursuant to M. R. Evid. 202(b)(6), takes judicial notice of Cody's conviction for two counts of assault with a weapon and sentence of ten years in Department of Corrections custody, with all but one year suspended.

## Distribution of Marital Estate

¶10    A district court must "equitably apportion" the property in a martial estate under § 40-4-202(1), MCA. Though a district court is "vested with broad discretion in apportioning a marital estate," *Crowley*, ¶ 26, it "must determine and consider the assets and liabilities of each of the parties." *In re Marriage of Funk*, 2012 MT 14, ¶ 24, 363 Mont. 352, 270 P.3d 39 (citing § 40-4-202, MCA). We will not disturb a district court's division or valuation of property "[a]bsent clearly erroneous findings" or "an abuse of discretion." *Funk*, ¶ 6. A district court abuses its discretion if it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *In re Marriage of Thorner*, 2008 MT 270, ¶ 21, 345 Mont. 194, 190 P.3d 1063 (citations omitted).

¶11    Cody makes several objections to the District Court's division of the marital estate. He first contends that the District Court's order that he make an equalization payment "clearly shows" that the court divided the property inequitably to "punish" him. Cody asserts also that the division of the marital estate is not supported by substantial evidence.

¶12    The District Court made extensive findings supporting its division of the marital estate. The court first awarded each party their respective homes, finding that Cody had purchased and fully paid for the Harlowton house prior to the parties' marriage and that Keldah had purchased the Big Timber house with pre-marital assets. Though Cody made some non-monetary contributions to the Big Timber home by mowing or doing yard work, the court found these contributions to be *de minimus*. The court similarly declined to credit Keldah for the $10,786.82 she contributed from personal accounts toward the Harlowton

6

home. Regarding the parties' retirement accounts, the District Court awarded Cody sole ownership of his retirement account worth $10,061 and awarded Keldah sole ownership of her two Vanguard accounts and a Fidelity account owned prior to the marriage. The court determined that the growth in Keldah's three retirement accounts during the marriage was a marital asset to be divided equally between the parties. The court awarded Cody numerous vehicles, campers, trailers, and other off-road vehicles, worth $135,120, and awarded each party half the proceeds from the sale of their cattle at auction and half the proceeds from the sale of their swather. In total, the court awarded Cody assets worth $171,035 and Keldah assets worth $49,844. The court ordered that Cody pay an equalization payment of $60,595.50 so that each party received a net value of $110,439.50. The court further ordered that Cody reimburse Keldah $1,619.87 for expenses incurred by Keldah and D.O.P. fleeing his abuse and $5,920 as reimbursement for out-of-pocket counseling expenses incurred by Keldah and D.O.P.

¶13    The District Court fully considered the unique circumstances of the parties' marriage, noting its "short duration," the parties' "good health" and "quite similar" earning capacities, and Keldah's financial contributions to the Harlowton home, the Big Timber home, and Ivory that she made with pre-marital assets from the sale of her Oregon home. The court noted further that "Keldah ha[d] incurred expenses relative to Cody's abusive conduct, including uprooting and moving to an undisclosed location." The court declined to award Keldah most of the expenses she sought regarding Cody's conduct but explained that "it [was] a matter considered in the property distribution." That the court considered the financial impact of Cody's conduct on Keldah does not amount to the court "punishing"

7

Cody for his behavior. Instead, it shows that the court gave full consideration to the circumstances of the case. Section 40-4-202(1), MCA.

¶14 The court similarly did not award Cody "significantly less property than Keldah." The court ordered Cody to pay Keldah an equalization payment because he was awarded more assets. The equalization payment served to provide each party with the same net value of $110,439.50. The District Court made substantial findings explaining how the circumstances of the case shaped its apportionment of the estate, and the record supports the court's determination.

¶15 Cody next asserts that the court erred when it awarded Keldah, a five percent owner of Ivory, half of Ivory's bank account. Citing *Miller v. Miller*, 189 Mont. 356, 616 P.2d 313 (1980), Cody argues that the parties' "agreement on Ivoryhorn" controls the court's distribution of the bank account. It is unclear, however, what agreement Cody is referencing as no such agreement was introduced at trial. Presuming that an agreement between the parties setting forth their ownership interests does exist, Cody's argument conflates a contract governing a business relationship with a separation agreement. A separation agreement permits parties, "upon their separation or the dissolution of their marriage," to enter into a written agreement that contains provisions for the "disposition of any property owned by either of them," among other terms. Section 40-4-201(1), MCA. The terms of a separation agreement generally are binding upon the court. Section 40-4-201(2)-(3), MCA. Any agreement by the parties governing their ownership interests in Ivory is not a separation agreement as defined by § 40-4-201, MCA.

8

¶16 Cody ignores the District Court's finding, supported by the evidence, that "Keldah contributed approximately $41,563 towards Ivory . . . during the marriage[] from her personal accounts" and that she "helped with the books, prepared tax information, paid bills, maintained licensing, cooked meals, and cleaned cabins" for Ivory without formal compensation. Though Keldah owned only five percent of Ivory, the District Court distributed the business's bank account in a manner it deemed equitable. Section 40-4-202, MCA. Again, the evidence supports the court's decision.

¶17 Cody also objects to the District Court's January 2020 valuation date, arguing that it should have valued the Ivory account using the September 2019 date the court used to value the Big Timber property and other assets. "As a general rule, the value of a marital estate should be determined at or near the time of dissolution." *In re Marriage of Hochhalter*, 2001 MT 268, ¶ 17, 307 Mont. 261, 37 P.3d 665 (citation and internal quotations omitted). A district court may deviate from the general rule, however, when "unique circumstances" exist. *Hochhalter*, ¶ 17 (citations omitted). As the District Court explained, it valued the Ivory account as of the date the court issued the decree of separation. Keldah signed her interest in Ivory over to Cody per the decree, and the court found that Cody has "treated [Ivory] as his own" since January 2020. The District Court exercised its discretion and determined that January 2020 marked the end of the parties' business relationship for purposes of distributing the Ivory account.

¶18 Cody's remaining arguments regarding the District Court's distribution of the marital estate are undeveloped and unclear. "It is not this Court's obligation to conduct legal research on behalf of a party, to speculate a party's precise position, or to develop

legal analysis that may lend support to the position." *In re Fossen*, 2019 MT 119, ¶ 23, 395 Mont. 495, 443 P.3d 418 (citation omitted); *see also* M. R. App. P. 12(1)(g). Upon reviewing the District Court's extensive findings, we are convinced that the court carefully considered the evidence. The court's apportionment of the parties' property was fair and reasonable given the unique circumstances of the case, and it is supported by substantial credible evidence in the record.

***Order of Protection***

¶19 Cody next takes issue with the District Court's permanent order of protection. We review a district court's decision to continue, amend, or make permanent an order of protection for abuse of discretion. *Lockhead v. Lockhead*, 2013 MT 368, ¶ 12, 373 Mont. 120, 314 P.3d 915 (citations omitted).

¶20 Cody contends that the District Court failed to include statutory language required by § 40-15-204(9), MCA, in its final decree. Because the final decree made permanent the court's August 12, 2019 temporary order of protection, he argues that the omission of statutory language renders the order of protection "invalid." The purpose of the language mandated by § 40-15-204(9), MCA, is to put the respondent on notice that a violation of an order of protection is a crime and that the respondent "is forbidden to do any act listed in the order[.]" The temporary order of protection did contain the necessary language, and Cody was on notice that he would be criminally liable for a violation of the order. That the final decree does not contain the same statutory language does not amount to an abuse of discretion when the temporary order of protection complied with statute and the decree made that order permanent. Cody had notice of the limitations the order imposed on him.

¶21 Cody next argues that the final decree does not "indicate[] whether there are any other civil or criminal actions pending involving the parties" as required by § 40-15-204(6), MCA, because it does not reference the dissolution or Cody's criminal proceedings. Keldah filed the order of protection within the dissolution proceeding. The District Court's final decree making permanent the order of protection too was part of the dissolution proceedings. The temporary order of protection plainly references Cody's criminal charges stemming from the August 9, 2020 incident. The order lists a "[f]elony charged in Sweet Grass County" under "criminal actions pending involving the petitioner and/or respondent[.]" The findings of fact and conclusions of law supporting the District Court's final decree also discuss the criminal charges pending at the time of the dissolution. The District Court did not abuse its discretion when it made Keldah's order of protection against Cody permanent.

***Parenting Plan***

¶22 Cody next asserts that the conditions the District Court's parenting order placed on him are "unreasonable" and violate his constitutional right to parent D.O.P. "A district court has broad discretion when considering the parenting of the child and we must presume that the court carefully considered the evidence and made the correct decision." *In re Parenting of C.J.*, 2016 MT 93, ¶ 13, 383 Mont. 197, 369 P.3d 1028 (citation and internal quotations omitted). We accordingly will not disturb a district court's decision regarding a parenting plan absent clearly erroneous findings unless the court abused its discretion. *In re C.J.*, ¶ 13.

¶23 A district court must "determine the parenting plan in accordance with the best interest of the child." Section 40-4-212(1), MCA. The court "shall consider all relevant parenting factors" when making parenting determinations. Section 40-4-212(1), MCA. The District Court considered and made specific findings as to each relevant parenting factor.

¶24 Given Cody's history of domestic violence and substance abuse, the District Court set forth several parameters Cody must meet to be reunified with D.O.P. The court required that Cody attend counseling regularly "for both substance abuse aftercare and relapse prevention as well as personal counseling [to address] his domestic violence." The court prohibited communication between Cody and D.O.P. while his criminal case remained "unresolved" and while he received "rehabilitative counseling." The court provided a process for reunification once Cody had received counseling and remained sober for "at least one year[,]" served all required time in custody, if any, and underwent "a psychological evaluation by a psychologist mutually agreed upon by the parties." The final decree directs the evaluator to "make a recommendation as to whether it is physically and emotionally safe for D.O.P. and Cody to commence a reunification process." Finally, the District Court included D.O.P. in the permanent restraining order against Cody but provided that the order could be modified in the future when reunification occurs.

¶25 Cody first asserts that these conditions are not in D.O.P.'s best interest. But he fails to elaborate on this argument or point to any evidence the court failed to consider or error the court committed. In crafting the parenting plan, the District Court made extensive findings and conclusions regarding the statutory factors. It considered the wishes of both

12

Keldah and Cody but noted that "Cody did not testify at [trial] regarding D.O.P. or his wishes regarding a parenting plan." The court discussed D.O.P.'s familial ties with both parties' families, explaining that Cody had a good relationship with D.O.P. "for periods of time" but that "much of Cody's abusive conduct . . . took place in D.O.P.'s presence." The court explained the "severe and detrimental emotional impact" Cody's abuse had on D.O.P., including the impact of having to relocate. It raised concerns with Cody's "long-standing mental health [and] substance abuse" problems, noting its "great concern" for Cody's lack of regard for the impact his abusive conduct has had on D.O.P. The court did account for Cody's sobriety since the August 10, 2020 incident and noted that he had attended in-patient treatment for his alcoholism. The court considered Cody's pending criminal case stemming from his domestic violence. Finally, the court concluded that "the testimony and evidence demonstrate that it would be detrimental to D.O.P.'s best interests to have contact with Cody . . . due to the abusive conduct Cody has engaged in D.O.P.'s presence that has caused D.O.P. emotional harm."

¶26 Cody contends that the District Court overlooked evidence of his sobriety and in-patient treatment and disregarded the testimony of his counselor, Peggy Albee. This is untrue. The District Court's findings and conclusions reflect a careful consideration of the record, including evidence of Cody's sobriety and treatment. Moreover, the District Court explained why it could not rely on Albee's testimony. Though Albee testified positively to Cody's progress in counseling, she was unaware of the extent of Cody's conduct, including that Cody had been arrested for banging on Keldah's doors and windows and that Cody sent Keldah "harassing and vulgar text messages"—in one of which he

13

threatened to "drive straight down [to her house] and it won't be pretty[.]"  Because "Cody was not forthcoming and honest with . . . Albee," the court found her opinion "unreliable." The court noted that these omissions demonstrate that Cody had not yet taken full "responsibility for his conduct that has been harmful to both Keldah and D.O.P."  It is the District Court's role as the trier of fact, not that of this Court on appeal, "to make credibility determinations and weigh the evidence," and we will not disturb the court's credibility determinations when they are supported by substantial credible evidence, as they are here. *Truss Works v. Oswood Constr. Co.*, 2022 MT 42, ¶ 19, 408 Mont. 27, 504 P.3d 1116.

¶27    Cody next argues that the District Court violated his "fundamental constitutional right to parent" D.O.P. and granted him "fewer parenting rights than parents in an abuse and neglect case."  The law recognizes that a parent's "constitutionally protected interest in the parental control of a child should yield to the best interests of the child when the parent's conduct is contrary to the child-parent relationship."  Section 40-4-227(2)(b), MCA.  Although "it is in the best interests of a child to maintain a relationship with a natural parent, a natural parent's inchoate interest in the child requires constitutional protections only when the parent has demonstrated a timely commitment to the responsibilities of parenthood[.]"  Section 40-4-227(2)(a), MCA.  The District Court explained in detail, first, why Cody's violent behavior in D.O.P.'s presence was "contrary to the child-parent relationship," and second, why it is not in D.O.P.'s best interest to maintain a relationship with Cody until he receives counseling regarding his alcoholism and domestic violence.

14

¶28 We are unpersuaded by Cody's attempts to downplay his actions on August 10, 2020. He argues that "[n]o person was physically harmed" and makes a veiled attack on Keldah's credibility by stating that "someone would have called 911" "if the facts were as Keldah alleged[.]" The District Court recognized that the trauma D.O.P. endured witnessing Cody hold his mother at gunpoint and threaten to "fucking kill her" cannot be overstated. As the court found and as the record demonstrates, Cody's behavior has had a profound impact on D.O.P. Cody's arguments on appeal demonstrate that he continues to lack "awareness or regard for the manner in which his abusive conduct, carried out in the presence of his son, would harm D.O.P."

¶29 The District Court did not abuse its discretion when it provided clear conditions for Cody to meet before being reunified with D.O.P. The conditions are proportional to the circumstances of the case and ensure that D.O.P.'s best interests are protected. The District Court's permanent order of protection restricting Cody's conduct with D.O.P. is similarly not an abuse of discretion when D.O.P. was "a witness to abuse" and was "endangered by the environment of abuse" perpetuated by Cody. *See* § 40-15-204(4), MCA.

### *Child Support*

¶30 We review a child support award for an abuse of discretion, applying a presumption in favor of a district court's determination of child support. *Stevens v. Stevens*, 2011 MT 106, ¶ 6, 360 Mont. 344, 253 P.3d 877 (citations omitted).

¶31 The District Court ordered Cody to pay Keldah $1,133 a month in child support. Cody contends that the court's child support order fails to comply with § 40-4-204, MCA, because it lacks a medical support order. Section 40-4-204(4), MCA, states that an "order

15

establishing a child support obligation . . . must include a medical support order[.]" A medical support order is a "judgment, decree, or order . . . that provides for the medical care of a child[.]" Section 40-5-804(8), MCA. The District Court's amended final decree plainly includes a medical support order that complies with § 40-5-807, MCA.

¶32 Cody next argues that "Keldah's income was not supported by documentation" and that the District Court did not value her income properly. But this argument overlooks Cody's own trial evidence, including Keldah's income and expense disclosure, the parties' joint tax returns from 2017 through 2019, Keldah's W-2s from 2016 through 2019, and a pay stub from Keldah's employer showing her year-to-date income from January to November 30, 2020. Keldah's income therefore was supported by substantial documentation and was not, as Cody asserts, supported only by her testimony.

¶33 Because the child support calculation was premised on evidence Cody introduced and the order complied with statute, Cody has failed to establish that the District Court erred in awarding Keldah support for D.O.P.

***Attorney Fees and Costs on Appeal***

¶34 Keldah asks this Court to impose sanctions against Cody pursuant to M. R. App. P. 19(5) in the form of attorney fees and costs she incurred in responding to Cody's appeal. The Court may issue sanctions, including costs and attorney fees, when we determine that an appeal is "frivolous, vexatious, filed for the purpose of harassment or delay, or taken without substantial or reasonable grounds." M. R. App. P. 19(5). Awarding sanctions is "the exception, and this Court will only impose sanctions where the appeal is entirely unfounded and intended to cause delay, or where counsel's actions otherwise constitute an

abuse of the judicial system." *Little Big Warm Ranch, LLC v. Doll*, 2018 MT 300, ¶ 22, 393 Mont. 435, 431 P.3d 342 (citations and internal quotations omitted).

¶35 Cody's appeal is wholly without merit. His briefs misrepresent the record and lack substantive legal research to support his claims. Two of his arguments on appeal relate to statutorily mandated language clearly contained in the District Court's final decree and order of protection. He fails to articulate error with the District Court's extensive and complete findings and instead forwards unclear and conclusory assertions lacking substantive legal authority. We accordingly conclude that Cody's appeal is entirely unfounded, clearly intended to harass Keldah and delay proceedings, and taken without substantial or reasonable grounds. *See Jonas v. Jonas*, 2013 MT 202, ¶¶ 24-25, 371 Mont. 113, 308 P.3d 33. Pursuant to M. R. App. P. 19(5), we award Keldah her attorney fees and costs in defending this appeal.

¶36 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review. We affirm the District Court's final decree and remand for the court to determine Keldah's reasonable attorney fees and costs in defending this appeal.

/S/ BETH BAKER

We Concur:
/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ JIM RICE